MARCIA BERMAN (Pro Hac Vice)
U.S. Department of Justice, Civil Division
901 E Street, N.W., Room 1043
Washington, D.C. 20530
Tel: (202) 514-3330
Fax: (202) 616-8470

CARLIE CHRISTENSEN
Assistant United States Attorney (0633)
185 South State Street, #400
Salt Lake City, Utah 84111-1538
Tel: (801) 524-5682
Fax: (801) 524-6924

*Attorneys for the United States Bureau of Reclamation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| **LIVING RIVERS, INC.,** | : | |
| | : | |
| Plaintiff, | : | **Civil No.** |
| | : | **2:02 CV 0644 TC** |
| vs. | : | |
| | : | |
| **UNITED STATES BUREAU OF** | : | **CROSS-MOTION FOR** |
| **RECLAMATION,** | : | **SUMMARY JUDGMENT** |
| | : | |
| Defendant. | : | **Hon. Tena Campbell** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNITED STATES BUREAU OF RECLAMATION'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, WITH EXHIBITS



# TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

COUNTER-STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   THE INUNDATION MAPS ARE EXEMPT FROM DISCLOSURE
     UNDER LAW ENFORCEMENT EXEMPTIONS 7(E) AND 7(F) . . . . . . . . . . . . . . . . 5

     A.   The Inundation Maps Were Compiled For Law Enforcement Purposes . . . . . . . . 5

     B.   Release Of The Inundation Maps Would Disclose The Type Of Sensitive
          Law Enforcement Information Protected By Exemption 7(E) . . . . . . . . . . . . . . 10

     C.   The Inundation Maps Must Be Withheld Under Exemption 7(F) To
          Protect The Lives Of Individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.  THE HOOVER DAM INUNDATION MAPS ARE EXEMPT FROM
     DISCLOSURE UNDER THE AUTHORITY OF ANOTHER STATUTE
     PURSUANT TO EXEMPTION 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. THE INUNDATION MAPS ARE PROPERLY WITHHELD FROM
     DISCLOSURE UNDER EXEMPTION 2 AS RECORDS RELATING
     SOLELY TO THE INTERNAL PERSONNEL PRACTICES OF AN
     AGENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     A.   Exemption 2 Protects Both Information Related To Trivial, Administrative
          Matters And Information Related To More Substantive Matters Where
          Disclosure Would Risk Circumvention Of The Law . . . . . . . . . . . . . . . . . . . . . . 15

     B.   The Inundation Maps Meet The Test For Exempt "High 2" Information  . . . . . . 19

     C.   The Tenth Circuit Has Recognized The "High 2" Interpretation Of
          Exemption 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE**

Abraham & Rose, P.L.C. v. United States, 138 F.3d 1075 (6th Cir. 1998) ................................. 27

Andrews v. Veterans Administration, 838 F.2d 418 (10th Cir.), cert. denied,
488 U.S. 817 (1988) .......................................................................................................... 3

Assassination Archives and Research Center v. Central Intelligence Agency,
177 F. Supp. 2d 1 (D.D.C. 2001) .................................................................................. 3-4

Audubon Society v. U.S. Forest Service, 104 F.3d 1201 (10th Cir. 1997) ..................... 23, 24, 25

Beckette v. U.S. Postal Service, Civ. A. No. 90-1246-N,
1993 WL 730711 (E.D. Va. Mar. 11, 1993) ........................................................................ 26

Buffalo Evening News, Inc. v. U.S. Border Patrol, 791 F. Supp. 386 (W.D.N.Y. 1992) ..... 18, 21

Caplan v. Bureau of Alcohol, Tobacco & Firearms, 587 F.2d 544 (2d Cir. 1978) ......... 17, 18, 26

Church of Scientology v. U.S. Department of the Army, 611 F.2d 738 (9th Cir. 1979) .............. 6

Commonwealth of Massachusetts v. U.S. Department of Health and Human Services,
727 F. Supp. 35 (D. Mass. 1989) ...................................................................................... 26

Cox v. Department of Justice, 576 F.2d 1302 (8th Cir. 1978) ..................................................... 27

Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051 (D.C. Cir. 1981) ...... passim

Cuneo v. Laird, 338 F. Supp. 504 (D.D.C. 1972) ........................................................................ 19

Department of the Air Force v. Rose, 425 U.S. 352 (1976) ............... 3, 15, 16, 17, 23, 25, 26, 27

Dirksen v. U.S. Department of Health and Human Services,
803 F.2d 1456 (9th Cir. 1986) ................................................................................... 17, 18, 26

Durns v. Bureau of Prisons, 804 F.2d 701 (D.C. Cir. 1986),
vacated on other grounds, 408 U.S. 1029 (1988) ............................................................. 11

Ford v. West, 149 F.3d 1190, 1998 WL 317561 (10th Cir. June 12, 1998) ................................. 5

Frito-Lay v. U.S. Equal Employment Opportunity Commission,
964 F. Supp. 236 (W.D. Ky. 1997) .................................................................................. 4-5

Garcia v. U.S. Department of Justice, 181 F. Supp. 2d 356 (S.D.N.Y. 2002) ............................ 12

Gardels v. Central Intelligence Agency, 689 F.2d 1100 (D.C. Cir. 1982) .................... 3, 4, 13, 22

Goldsborough v. Internal Revenue Service, Civil No. Y-81-1939,
    1984 WL 612 (D. Md. May 10, 1984) ..................................................................... 26

Hale v. U.S. Department of Justice, 973 F.2d 894 (10th Cir. 1992),
    vacated on other grounds, 509 U.S. 918 (1993) ...................................................... 3, 11, 23, 25

Hardy v. Bureau of Alcohol, Tobacco & Firearms, 631 F.2d 653 (9th Cir. 1980) ......... 17, 18, 26

Hawkes v. Internal Revenue Service, 467 F.2d 787 (6th Cir. 1972) .......................................... 26

Hobart Corp. v. Equal Employment Opportunity Commission, 603 F. Supp. 1431 (S.D. Ohio
    1984), vacated, 716 F. Supp. 307 (S.D. Ohio 1985) ............................................................ 27

Hopkinson v. Shillinger, 866 F.2d 1185 (10th Cir. 1989) ............................................................ 5

Institute for Policy Studies v. Department of the Air Force,
    676 F. Supp. 3 (D.D.C. 1987) ................................................................. 18-19, 21, 23

John Doe Agency v. John Doe Corp., 493 U.S. 146 (1989) ......................................................... 8

KTVY-TV v. United States, 919 F.2d 1465 (10th Cir. 1990) ....................................................... 8

Kaganove v. Environmental Protection Agency, 856 F.2d 884 (7th Cir. 1988), cert. denied,
    488 U.S. 1011 (1989) ................................................................................................ 26, 28

Larouche v. Webster, No. 75 Civ. 6010, 1984 WL 1061 (S.D.N.Y. Oct. 23, 1984) .................. 12

Librach v. Federal Bureau of Investigation, 587 F.2d 372 (8th Cir. 1978), cert. denied,
    440 U.S. 910 (1979) ........................................................................................................ 9, 10

Maricopa Audubon Society v. U.S. Forest Service, 108 F.3d 1082 (9th Cir. 1997) ............. 24, 25

Miller v. Department of Justice, Civ. A. No. 87-0533,
    1989 WL 10598 (D.D.C. Jan. 31, 1989) ......................................................................... 18, 23

Moorefield v. U.S. Secret Service, 611 F.2d 1021 (5th Cir.), cert. denied,
    449 U.S. 909 (1980) ............................................................................................................. 8

Sanders v. U.S. Department of Justice, Civ. A. No. 91-2263-0,
    1992 WL 97785 (D. Kan. April 21, 1992) ..................................................................... 12

Savoie v. Internal Revenue Service, 544 F. Supp. 662 (W.D. La. 1982) ..................................... 26

Schiller v. National Labor Relations Board, 964 F.2d 1205 (D.C. Cir. 1992) ...................... 17, 18

Schwaner v. Department of the Air Force, 898 F.2d 793 (D.C. Cir. 1990) ........................... 24, 25

Sladek v. Bensinger, 605 F.2d 899 (5th Cir. 1979) .................................................................. 26

Stokes v. Brennan, 476 F.2d 699 (5th Cir. 1973) .................................................................... 26

Tickel v. Internal Revenue Service, No. Civ-1-85-709,
    1986 WL 14436 (E.D. Tenn. Aug. 22, 1986) ..................................................................... 27

U.S. News & World Report v. Dept. of the Treasury, Civ.
    Action No. 84-2303, 1986 U.S. Dist. LEXIS 27634
    (D.D.C. Mar. 26, 1986) ................................................................................ 8, 9, 10, 11

United States v. Eastern Air Lines, Inc., 792 F.2d 1560 (11th Cir. 1986) .................................. 8

Voinche v. Federal Bureau of Investigation, 940 F. Supp. 323 (D.D.C. 1996), aff'd, 1997
    WL 411685 (D.C. Cir. June 19, 1997), cert. denied, 522 U.S. 950 (1997) ............... 6, 18, 23

Wiesenfelder v. Riley, 959 F. Supp. 532 (D.D.C. 1997) ........................................................... 18

Wilder v. Commissioner of Internal Revenue, 601 F. Supp. 241 (M.D. Ala. 1984) .................. 26

Wilder v. Commissioner of Internal Revenue, 607 F. Supp. 1013 (M.D. Ala. 1985) ............... 26

Windels, Marx, Davies & Ives v. Department of Commerce,
    576 F. Supp. 405 (D.D.C. 1983) ..................................................................................... 4

Young v. Central Intelligence Agency, 972 F.2d 536 (4th Cir. 1992) ......................................... 4

Zamnik v. Department of State, Civ. Act. No. 79-1072 (D.D.C. 1979) ....................................... 9

## STATUTES, REGULATIONS AND LEGISLATIVE MATERIAL

5 U.S.C. § 552 et seq. ................................................................................................ passim

16 U.S.C. § 470w ........................................................................................................... 14

16 U.S.C. § 470w-3 .................................................................................................... 13, 14

43 C.F.R. § 422 et seq. ............................................................................................................ 6-7

43 U.S.C. § 373b ...................................................................................................................... 6

House Report No. 96-1457 on Pub. L. 96-515 ...................................................................... 14

H.R.Rep.No. 1497, 89th Cong., 2d Sess. (1966) ................................................................... 15

P.L. 107-69 (H.R. 2925) ........................................................................................................... 6

Pub. L. No. 93-502, 88 Stat. 1561, 1563 (1974) ................................................................... 12

S.Rep.No. 813, 89th Cong., 1st Sess. (1965) ........................................................................ 15

## INTRODUCTION

In this action brought pursuant to the Freedom of Information Act ("FOIA"), plaintiff Living Rivers seeks disclosure of maps that show which areas and communities downstream from the Hoover Dam and the Glen Canyon Dam would be flooded in the event of a catastrophic failure of the dams. The United States Bureau of Reclamation ("BOR"), which created and maintains these "inundation maps" for the purposes of evaluating the effects of dam failure and protecting the dams and downstream public, has reasonably determined that public disclosure of the maps would compromise dam security and the safety of the downstream communities. BOR's concern, patently rational post-September 11, is that these maps would provide a blueprint to terrorists of the amount and exact nature of damage that could be caused by destroying these dams. Terrorists could very plausibly use the maps to target these dams and to carry out plans to turn the dams into weapons of mass destruction. Accordingly, the inundation maps are just the kind of information that Congress intended to exempt from disclosure under FOIA.

## COUNTER-STATEMENT OF MATERIAL FACTS

On September 19, 2001, Living Rivers requested pursuant to FOIA copies of all "inundation maps, including those pertaining to dam failure," prepared by the BOR for the areas below Hoover Dam and Glen Canyon Dam. Ex. A, B.[1] On November 9 and 19, 2001, BOR denied the requests on the grounds that the maps are exempt from disclosure under FOIA's Exemption 2. BOR explained that the inundation maps relate solely to internal practices of BOR and that their disclosure would risk circumvention of law or regulation. Ex. C, D. Living Rivers appealed this decision administratively on December 10, 2001, and on April 2, 2002, the U.S.

---

[1]Lettered exhibits refer to the exhibits attached to Plaintiff's Motion for Summary Judgment. Numbered exhibits refer to the exhibits attached to this brief.

Department of the Interior (the agency in which BOR resides) denied that appeal. Ex. E, F.

In denying Living Rivers' appeal, the Department restated its position that the maps are predominantly internal and that their release would lead to a significant law enforcement risk. Ex. F. As such, the maps were withheld as exempt from disclosure under Exemption 2. The Department further explained that the maps, which BOR shares with state and local law enforcement agencies but not with the public, show which downstream areas and communities would be flooded in the event of a failure of Hoover Dam or Glen Canyon Dam. Id. The inundation maps are critical tools used by BOR to identify such at-risk communities and develop emergency response plans to deal with the event of a dam failure. Because they depict the extent of the harm that would be caused by a failure of either of the dams, "[t]he information in the maps could be used by potential terrorists to plan the means and manner of attacking the dam system to maximize the harm both to the system and to the surrounding communities." Id. at 2. The Department stated that a reassessment of its security systems and practices, compelled by the tragic events of September 11, 2001, confirmed that release of the inundation maps to the public raised security concerns with respect to terrorism and other acts of violence. The inundation maps therefore needed to be exempted from disclosure to protect the dams and downstream regions. Id. at 6-8.

Living Rivers subsequently filed this FOIA action seeking release of the inundation maps for Hoover Dam and Glen Canyon Dam. Shortly after BOR filed its Answer to the Complaint, Living Rivers filed a motion for summary judgment, stating that there are no material facts in dispute. BOR agrees that there are no genuine issues of material fact, but contends that it is entitled to summary judgment. Accordingly, BOR opposes Living Rivers' motion for summary

2

judgment and cross-moves for summary judgment in its favor.

## ARGUMENT

The Freedom of Information Act was enacted to "'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" Department of the Air Force v. Rose, 425 U.S. 352, 361 (1976) (quoting Rose, 495 F.2d 261, 263 (2d Cir. 1974)). See also Andrews v. Veterans Administration, 838 F.2d 418, 422 (10th Cir.), cert. denied, 488 U.S. 817 (1988). However, the public's interest in government information under FOIA is not absolute – "[i]t extends only to information that sheds light upon the government's performance of its duties." Hale v. U.S. Department of Justice, 973 F.2d 894, 898 (10th Cir. 1992), vacated on other grounds, 509 U.S. 918 (1993) (Mem.). Accordingly, FOIA's general provision that any person has a right, enforceable in district court, to obtain access to federal agency records, is expressly limited by nine specific exemptions from disclosure. 5 U.S.C. § 552(b). "These exemptions reflect Congress' recognition that the Executive Branch must have the ability to keep certain types of information confidential." Hale, 973 F.2d at 898.

Although the agency has the burden of justifying nondisclosure of information in a FOIA action, the district court must accord substantial weight to affidavits submitted by the agency in support of claimed exemptions. 5 U.S.C. § 552(a)(4)(B). Consequently, summary judgment is often granted in FOIA cases on the basis of agency affidavits. If the affidavits provide specific information sufficient to place the documents within the claimed exemption, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate. Gardels v. Central Intelligence Agency, 689 F.2d 1100, 1104-05 (D.C. Cir. 1982); Assassination Archives and Research Center v. Central Intelligence

3

Agency, 177 F. Supp. 2d 1, 5-6 (D.D.C. 2001); Windels, Marx, Davies & Ives v. Department of Commerce, 576 F. Supp. 405, 409-11 (D.D.C. 1983). This is in accordance with congressional intent that courts give agency affidavits substantial weight in recognition of the agency's expertise, particularly in cases concerning questions of national security. Gardels, 689 F.2d at 1104-05; Assassination Archives and Research Center, 177 F. Supp. 2d at 5-6. Significantly, the test is not whether the court agrees with the agency's evaluation of the need to protect the information from disclosure, but rather whether the agency's judgment is sufficiently specific, reasonable, plausible and made in good faith. Gardels, 689 F.2d at 1105. As one court has observed, "in FOIA cases it has been held that disputes regarding the risks created by disclosure, inherently a matter of some speculation, are not sufficient to create a triable issue of fact when the agency possessing relevant expertise has provided sufficiently detailed affidavits to justify its position that disclosure would pose significant risks." Windels, Marx, Davies & Ives, 576 F. Supp. at 410.

The inundation maps that Living Rivers seeks are protected from public disclosure by FOIA's Exemptions 7(E) and 7(F), pertaining to information compiled for law enforcement purposes; Exemption 3, which incorporates nondisclosure provisions of other federal statutes; and Exemption 2, covering records related solely to the internal personnel rules and practices of an agency.[2]

_____

[2]BOR did not waive any exemptions by only relying on Exemption 2 in denying Living Rivers' FOIA request at the administrative level. Because FOIA directs district courts to review agency actions de novo, an agency may raise a particular exemption for the first time in district court. 5 U.S.C. § 552(a)(4)(B); see, e.g., Young v. Central Intelligence Agency, 972 F.2d 536, 538-39 (4th Cir. 1992) (FOIA's provision of de novo judicial review means that agencies do not litigate FOIA requests and therefore do not waive FOIA exemptions by not raising them during administrative process); Frito-Lay v. U.S. Equal Employment Opportunity Commission, 964 F.

## I. THE INUNDATION MAPS ARE EXEMPT FROM DISCLOSURE UNDER LAW ENFORCEMENT EXEMPTIONS 7(E) AND 7(F).

FOIA's Exemption 7 protects from disclosure "information compiled for law enforcement purposes" where release of the information ". . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7). Because the inundation maps were compiled for law enforcement purposes and their disclosure would cause these particular harms, the maps are exempt from disclosure.

### A. The Inundation Maps Were Compiled For Law Enforcement Purposes.

Exemption 7 protects a broad array of information used for law enforcement purposes. Indeed, in 1986, Congress amended Exemption 7 to expand its protection from "investigatory records" compiled for law enforcement purposes to all "records or information" compiled for law enforcement purposes. Hopkinson v. Shillinger, 866 F.2d 1185, 1222 n. 27 (10th Cir. 1989), overruled on other grounds, see Sawyer v. Smith, 497 U.S. 227 (1990). Thus, records generated for general law enforcement purposes but not related to a specific investigation come within

---

Supp. 236, 239 (W.D. Ky. 1997) (agency's failure to raise exemption at any level of administrative process does not preclude it from raising exemption at district court level). See also Ford v. West, 149 F.3d 1190, 1998 WL 317561, at * 1 (10th Cir. June 12, 1998) (unpublished opinion) (addressing exemption raised for first time in district court) (attached hereto as Ex. 1).

Moreover, while BOR did not expressly rely on Exemptions 3, 7(E) and 7(F) during the administrative process, BOR is not raising any additional reasons for withholding the inundation maps from disclosure. All of BOR's arguments in support of the claimed exemptions ultimately flow from the core concern originally identified by BOR in its administrative response: that release of the inundation maps could aid terrorists and others intent on attacking the dams.

Exemption 7's protection.  See, e.g., Voinche v. Federal Bureau of Investigation, 940 F. Supp. 323, 332 (D.D.C. 1996) (holding information relating to safety procedures afforded to Supreme Court and its justices protected under Exemption 7(E)), aff'd, 1997 WL 411685 (D.C. Cir. June 19, 1997) (per curiam), cert. denied, 522 U.S. 950 (1997).

In order to establish the threshold requirement under Exemption 7 that the information was compiled for law enforcement purposes, an agency that has both law enforcement and administrative functions must demonstrate that its purpose in compiling the particular document fell within its sphere of enforcement authority.  Church of Scientology v. U.S. Department of the Army, 611 F.2d 738, 748 (9th Cir. 1979).  BOR, an agency devoted to managing, developing and protecting the country's water resources, has express statutory law enforcement authority, and is therefore an agency with both law enforcement and administrative functions.  On November 12, 2001, Congress enacted legislation providing for law enforcement authority at BOR facilities.  43 U.S.C. § 373b.  The purpose of this Act was to "provide for the security of dams, facilities, and resources under the jurisdiction of the Bureau of Reclamation."  P.L. 107-69 (HR 2925).  The Act, inter alia, directs the Secretary of the Interior to issue regulations necessary to maintain law and order and protect persons and property within Reclamation projects and on Reclamation land; authorizes law enforcement personnel from the Department of the Interior, other federal agencies and state and local governments to act as law enforcement officers; and specifies the powers afforded to law enforcement officers on Reclamation projects and lands.  43 U.S.C. § 373b(a), (c), (d).

Pursuant to this statutory law enforcement authority, BOR has issued implementing regulations and established a law enforcement program on Reclamation projects and lands.  43

C.F.R. § 422 et seq. As part of this program, and in response to enhanced security concerns in the wake of the events of September 11, 2001, BOR recently established a Security, Safety and Law Enforcement Office (the "Office"), with responsibility for dam safety and security. (See September 9, 2002 BOR Press Release, attached hereto as part of Ex. 2). The Office is responsible for developing and implementing anti-terrorism programs and policies at Reclamation facilities, including dams. (Todd Declaration at ¶¶ 1, 8, 9, attached hereto as Ex. 3).[3]

The inundation maps prepared by BOR for the areas below Hoover Dam and Glen Canyon Dam are a critical part of the dam security program. The maps show which downstream areas would be flooded in the event of a dam failure and are at risk of being targeted for a terrorist attack. (Id. at ¶ 12). BOR prepares and uses the maps to protect the dams and downstream communities from an intentional attack on the dams. (Id. at ¶ 11). BOR shares the maps with state and local law enforcement in a joint effort to warn and plan for the evacuation of potential flood zones. (Id. at ¶¶ 26-30). The maps also help BOR security personnel allocate security resources to protect dams shown to be most at-risk. (Id. at ¶ 10). The maps are an integral part of BOR's dam security plans and procedures, and directly serve BOR's law enforcement purpose of providing for the security of dams, facilities and resources under its

_____

[3]Following the terrorist attacks on September 11, BOR enhanced security measures at Hoover Dam and Glen Canyon Dam, reflecting concerns that the dams could be targets of terrorism. Immediately after the attacks in New York and Washington, BOR closed down tours and public access to both dams, as well as access to the Colorado River below Glen Canyon Dam, and security at BOR dams and power plants was on the highest alert. When tours eventually resumed at the dams, they were modified to incorporate new security measures and precautions, such as limited access to the dams and power plants, and security concerns continue to impact on tours at the dams. (See Ex. 2).

jurisdiction. Accordingly, BOR's purpose in compiling and using the inundation maps falls

within the sphere of its statutory law enforcement authority.[4]

The fact that BOR's law enforcement efforts are focused on protection and prevention,

rather than the more traditional law enforcement functions of investigation and prosecution, is

immaterial. In an analogous case, a district court held that the Secret Service properly withheld

pursuant to Exemption 7(E) specifications and other information relating to the purchase of two

armored presidential limousines, even though such information did not relate to an investigation

of a specific violation of law. U.S. News & World Report v. Dept. of the Treasury, Civ. Action

No. 84-2303, 1986 U.S. Dist. LEXIS 27634, at * 3-5 (D.D.C. Mar. 26, 1986). The court

cogently reasoned that:

> The Secret Service is unique in that its law enforcement efforts are geared
> primarily towards prevention rather than apprehension. While its activities in this
> case, therefore, do not involve investigating someone suspected of violating the
> law, but center instead on its efforts to protect the President, there can be no doubt
> that they are directly related to the agency's statutory mandate. The Secret
> Service, in soliciting bids and designing the limousines, undertook an
> investigation as to how best to safeguard the President, and thus engaged in active
> and concrete efforts to enforce the law.

Id. at *5. See also Moorefield v. U.S. Secret Service, 611 F.2d 1021, 1024 (5th Cir.), cert.

denied, 449 U.S. 909 (1980) (holding documents prepared to help Secret Service fulfill its duty

to protect President were compiled for law enforcement purposes); United States v. Eastern Air

Lines, Inc., 792 F.2d 1560, 1561 n. 1 (11th Cir. 1986) (suggesting that airline security programs,

---

[4]It is irrelevant that the maps were created prior to the enactment of BOR's law
enforcement authority. The relevant time frame for determining whether information was
compiled for law enforcement purposes is when the Government invokes Exemption 7, not when
the information was originally compiled. John Doe Agency v. John Doe Corp., 493 U.S. 146,
153 (1989); KTVY-TV v. United States, 919 F.2d 1465, 1469 (10th Cir. 1990).

distributed only to those with an operational need to know, are exempt under Exemption 7(E));
Zamnik v. Department of State, Civ. Act. No. 79-1072 (D.D.C. 1979) (withholding under
Exemption 7(E) Foreign Affairs Manual containing methods for identifying and notifying Secret
Service of individuals who may pose threats to government officials) (attached hereto as Ex. 4).

Similarly, the court in Librach v. Federal Bureau of Investigation, 587 F.2d 372, 373 (8th
Cir. 1978) (per curiam), cert. denied, 440 U.S. 910 (1979), held that records in the possession of
the U.S. Marshal's Service pertaining to the relocation of a witness under the Witness Security
Program were exempt from disclosure under Exemption 7(E). The efforts of the Marshal's
Service to protect witnesses were assumed to be a law enforcement function, despite a preventive
rather than investigatory character, and the court affirmed the application of Exemption 7 on the
grounds that release of the materials "would jeopardize the effectiveness of the Witness Security
Program." Librach, 587 F.2d at 373. See also U.S. News & World Report, 1986 U.S. Dist.
LEXIS 27634 at *7.

Like the Secret Service and Marshall's Service, BOR's law enforcement efforts are geared
toward prevention and protection. BOR uses the inundation maps to enforce the law by
preventing a terrorist attack on Hoover Dam and Glen Canyon Dam. Preventing an attack on the
dams and protecting the dams and downstream communities from an attack in violation of the
law are just as important law enforcement functions as investigating a crime after the fact. Such
an attack would obviously violate any number of federal and state laws, and it is just such an
attack, along with its devastating consequences, that Congress authorized BOR to prevent. BOR
compiles and uses the inundation maps for law enforcement purposes, as required by Exemption
7.

**B.** Release Of The Inundation Maps Would Disclose The Type Of Sensitive Law Enforcement Information Protected By Exemption 7(E).

Public disclosure of the inundation maps would also cause the particularized harms set forth in Exemptions 7(E) and 7(F). Exemption 7(E) protects from disclosure information compiled for law enforcement purposes where release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). As demonstrated above, Congress meant Exemption 7(E) to protect from disclosure techniques and procedures used to prevent and protect against crimes as well as techniques and procedures used to investigate crimes after they have been committed. Librach, 587 F.2d at 373; U.S. News & World Report, 1986 U.S. Dist. LEXIS 27634 at *6-7.

Disclosure of the inundation maps could reasonably be expected to risk circumvention of the law because they would assist terrorists in assessing which potential targets of terrorism would cause the maximum damage in terms of loss of life and property. The maps show in a detailed and vivid way the communities that would be flooded by a catastrophic breach in the dams. (Todd Declaration at ¶¶ 12, 14). The risk that terrorists could use these maps to target specific dams and to plan and execute attacks, all in furtherance of illegal activities, is real indeed in the aftermath of September 11. As the head of BOR's Security, Safety and Law Enforcement Office states in his declaration:

> Within BOR's security program, a dam failure is considered a weapon of mass destruction because of the wide-spread damage that could follow in its wake. . . .
>
> The information shown on the inundation maps would compromise dam security

10

and the security of the surrounding populations if the maps fell into the hands of a terrorist or other person intending to harm one of more of the Colorado River dams . . . The inundation maps would give the terrorist information about the amount of damage that could be caused by destroying a dam. Because the inundation maps are based upon a worst-case scenario, they present a broad view of the extent of damage resulting from breaching the dam, thus making the dam a more attractive target to the terrorist.

(Id. at ¶¶15, 16). BOR has reasonably and specifically determined that the maps would compromise dam security and the security of downstream communities if they fell into terrorist hands. Indeed, if these maps are held releaseable under FOIA, terrorists could request and obtain them just as easily as any member of the public. See Durns v. Bureau of Prisons, 804 F.2d 701, 706 (D.C. Cir. 1986) (FOIA grants "the scholar and the scoundrel equal rights of access to agency records"), vacated on other grounds, 408 U.S. 1029 (1988) (Mem.).

Moreover, the inundation maps do not reveal information that is well known to the public and should not therefore be disclosed. See Hale, 973 F.2d at 902-03 (protecting security devices, among other things, from disclosure under Exemption 7(E); techniques and procedures known to the public may still be exempt if disclosure of the circumstances of their use could lessen their effectiveness); U.S. News & World Report, 1986 U.S. Dist. LEXIS 27634 at *7-8 (rejecting argument that techniques of protecting limousines from attack are well known to public so limousine specifications should be released). The maps show which specific communities, buildings, recreation areas, and critical infrastructure sites (such as power plants) would be affected by a dam failure, the extent of the damage, and even travel times for flood progression. (Todd Declaration at ¶ 12). The maps can also be used to determine the damage to be caused by attacking a dam relative to the damage to be caused by attacking other potential targets of terrorism. (Id. at ¶ 20). While it is of course a matter of common sense that a massive failure of

11

Hoover Dam or Glen Canyon Dam would cause flooding and harm to life and property, this more precise, valuable information is not common knowledge (if it were, Living Rivers would presumably not need BOR's maps). (Id. at ¶¶ 16-19, 21).

C.      The Inundation Maps Must Be Withheld Under Exemption 7(F) To Protect The Lives Of Individuals.

For these same reasons, public disclosure of the inundation maps "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). This exemption was broadened in 1986 to cover "any individual." Previously, the exemption protected records that "would . . . endanger the life or physical safety of law enforcement personnel." Pub. L. No. 93-502, 88 Stat. 1561, 1563 (1974) (subsequently amended). In its present expansive form, Exemption 7(F) clearly may be invoked to protect the lives of persons other than law enforcement personnel. See, e.g., Garcia v. U.S. Department of Justice, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (protecting private citizens and third parties); Sanders v. U.S. Department of Justice, Civ. A. No. 91-2263-0, 1992 WL 97785, at * 5 (D. Kan. April 21, 1992) (protecting from disclosure plaintiff's mental health records because disclosure could cause plaintiff to harm someone). Moreover, the exemption is not limited to known, named individuals, but is available to protect "any individual" reasonably at risk. See Larouche v. Webster, No. 75 Civ. 6010, 1984 WL 1061, at *8 (S.D.N.Y. Oct. 23, 1984) (Exemption 7(F) protects FBI laboratory report containing description of home-made machine gun because disclosure of report risks harm to any and all law enforcement personnel who face daily possibility of confronting armed individuals).

The inundation maps are compiled for law enforcement purposes and disclosure of them

could reasonably place at risk the life or physical safety of those individuals who occupy the downstream areas that would be flooded by a breach of Hoover Dam or Glen Canyon Dam. BOR's judgment that the maps need to be shielded from the eyes of terrorists in order to protect the dams and surrounding communities from possible devastation is eminently reasonable and is entitled to substantial weight in this case. See, e.g., Gardels, 689 F.2d at 1104-05.

## II.    THE HOOVER DAM INUNDATION MAPS ARE EXEMPT FROM DISCLOSURE UNDER THE AUTHORITY OF ANOTHER STATUTE PURSUANT TO EXEMPTION 3.

The inundation maps for the areas below Hoover Dam are also exempt from disclosure under FOIA's Exemption 3, which incorporates nondisclosure provisions contained in other federal statutes. Specifically, the National Historic Preservation Act's nondisclosure provision protects this information about Hoover Dam, a National Historic Resource and Landmark.

Under Exemption 3, disclosure need not be made as to information "specifically exempted from disclosure by statute" if the statute affords the agency no discretion on disclosure, establishes particular criteria for withholding the information, or refers to the particular types of material to be withheld. 5 U.S.C. § 552(b)(3). Section 304 of the National Historic Preservation Act, titled "Access to information" and codified at 16 U.S.C. § 470w-3, clearly qualifies as a nondisclosure provision under Exemption 3. Subsection (a) is titled "Authority to withhold from disclosure." It provides that "[t]he head of a Federal agency . . ., after consultation with the Secretary [of Interior], shall withhold from disclosure to the public, information about the location, character, or ownership of a historic resource if the Secretary and the agency determine that disclosure may– (1) cause a significant invasion of privacy; (2) risk harm to the historic resources; or (3) impede the use of a traditional religious site by practitioners." 16 U.S.C. §

470w-3(a); see also 16 U.S.C. § 470w (definitions). This provision on its face protects matters from disclosure and establishes particular criteria for withholding.

The inundation maps for Hoover Dam fall within the withholding provisions of this statute. The statute defines "historic resources" as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion on the National Register, including artifacts, records, and material remains related to such a property or resource." 16 U.S.C. § 470w(5). "National Register" means the National Register of Historic Places. 16 U.S.C. § 470w(6). Hoover Dam is listed on the National Register of Historic Places and is also designated as a National Historic Landmark. (Todd Declaration at ¶ 3; National Register listings, attached hereto as Ex. 5). The inundation maps showing flood damage for the regions downstream from Hoover Dam in the event of a breach in Hoover Dam constitute "information about the . . . character . . . of a historic resource [Hoover Dam]." 16 U.S.C. § 470w-3(a). BOR and the Department of the Interior reasonably determined that disclosure of the maps "may . . . risk harm to the historic resource [Hoover Dam]" because of the very real concern that terrorists could use the maps to evaluate Hoover Dam as a potential weapon of mass destruction and to carry out a terrorist attack on the dam. 16 U.S.C. § 470w-3(a); Todd Declaration at ¶ 31. The intent of Section 304 of the National Historic Preservation Act was to "assure protection of [historic] sites from theft, vandalism or destruction." House Report No. 96-1457 on Pub. L. 96-515, see 1980 U.S. Code Cong. and Adm. News, at 6409. The inundation maps for Hoover Dam have been appropriately withheld from disclosure under 16 U.S.C. § 470w-3(a) to protect Hoover Dam from the risk of harm, and the maps are therefore exempt from disclosure under FOIA pursuant to FOIA's Exemption 3.

### III. THE INUNDATION MAPS ARE PROPERLY WITHHELD FROM DISCLOSURE UNDER EXEMPTION 2 AS RECORDS RELATING SOLELY TO THE INTERNAL PERSONNEL PRACTICES OF AN AGENCY.

FOIA's Exemption 2 protects from disclosure "matters that are . . . related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). Courts have developed two interpretations of Exemption 2 – "low 2" and "high 2" – as a way of reconciling differing language in the House and Senate reports on FOIA with respect to Exemption 2. The innundation maps fall within the "high 2" category of protected information.

> ### A. Exemption 2 Protects Both Information Related To Trivial, Administrative Matters And Information Related To More Substantive Matters Where Disclosure Would Risk Circumvention Of The Law.

Congress intended Exemption 2 to be narrower than its predecessor in the Administrative Procedure Act, which exempted from disclosure all internal management matters. Rose, 425 U.S. at 362-63. However, the House and Senate reports differed on the scope of the narrowed exemption. The Senate report gave as examples of Exemption 2 materials "rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like." S.Rep.No. 813, 89th Cong., 1st Sess., 8 (1965). The House report listed as examples of exempt internal matters "[o]perating rules, guidelines, and manuals of procedure for Government investigators or examiners," and stated that Exemption 2 would not cover all matters of internal management, "such as employee relations and working conditions and routine administrative procedures." H.R.Rep.No. 1497, 89th Cong., 2d Sess., 10 (1966). See Rose, 425 U.S. at 363. Thus, the Senate report contemplated that materials relating to minor matters of employment and working conditions would be exempt from disclosure, whereas the House report suggested that such materials would be released. See Crooker v. Bureau of Alcohol, Tobacco &

15

<u>Firearms</u>, 670 F.2d 1051, 1061 (D.C. Cir. 1981) (en banc). The House Report's statement that Exemption 2 covers more substantive matters ("[o]perating rules, guidelines, and manuals of procedure for Government investigators or examiners") is, however, uncontroverted in the Senate report. <u>Crooker</u>, 670 F.2d at 1061.

The Supreme Court addressed the differing language in the reports in <u>Rose</u>, an Exemption 2 case involving case summaries of honor and ethics hearings at service academies. <u>Rose</u>, 425 U.S. at 363-70. The Court stated that the primary concern behind the broader language in the House report was enabling agencies to withhold matters of some public interest where necessary to prevent outsiders from circumventing agency regulations or standards. <u>Id</u>. at 364, 366-67. Courts faced with FOIA requests for such materials had therefore looked to the House report to justify withholding the materials. The <u>Rose</u> Court chose to rely on the Senate report because disclosure of the case summaries did not pose a danger of circumvention of the law – there was no danger that the subjects of regulation, the academy cadets, would use the case summaries to circumvent the academy honor and ethics codes (indeed, cadets were shown the summaries precisely for the purpose of encouraging code compliance). Because the materials at issue did not raise the concern that disclosure might risk circumvention of agency regulations or standards, the Court expressly declined to rule on the applicability of Exemption 2 to such matters. <u>Id</u>. at 364-67. The Court held that "<u>where the situation is not one where disclosure may risk circumvention of agency regulation</u>," Exemption 2 only protects from disclosure purely internal matters in which the public could not reasonably have an interest, thereby relieving agencies of the burden of releasing such material. <u>Id</u>. at 369-70 (emphasis added). Such predominantly internal information related to matters of a relatively trivial, administrative nature, in which the

public has no legitimate interest, is considered "low 2" information. See, e.g., Schiller v. National Labor Relations Board, 964 F.2d 1205, 1207 (D.C. Cir. 1992).

After Rose, courts presented with a claim that Exemption 2 applied to materials whose disclosure poses a risk of circumvention of agency regulation or standards not only correctly recognized that the Rose court left this question open (as Living Rivers acknowledges, at pages 10-11 of their brief), but found that Rose supported the application of Exemption 2 to such material. See Dirksen v. U.S. Department of Health and Human Services, 803 F.2d 1456, 1458 (9th Cir. 1986); Crooker, 670 F.2d at 1066; Hardy v. Bureau of Alcohol, Tobacco & Firearms, 631 F.2d 653, 656 (9th Cir. 1980); Caplan v. Bureau of Alcohol, Tobacco & Firearms, 587 F.2d 544, 547 (2d Cir. 1978). In Crooker, a leading case on this subject, the en banc Court of Appeals for the D.C. Circuit extensively analyzed the legislative history and case law and concluded that Exemption 2 protects internal materials whose disclosure poses a risk of circumvention of law. One of the building blocks of the court's decision was the holding that the phrase "internal personnel rules and practices of an agency" encompasses not merely minor matters of employment, but extends to other rules and practices governing agency personnel. Crooker, 670 F.2d at 1056. The court determined that Exemption 2 was intended to cover materials that instruct agency personnel how to do the substantive aspects of their jobs; it was not meant to be limited to the kinds of matters that the term "personnel" often connotes -- that is, matters relating to pay, pension, vacations, hours of work, lunch hours, parking, and the like. Id. at 1056, 1073.

From here, the Crooker court formulated what has become widely accepted as the test for "high 2" exempt information: if a document is "predominantly internal" and if its disclosure would significantly risk circumvention of agency regulation or statute, it is exempt from

disclosure under Exemption 2. Id. at 1073-74. Information is "predominantly internal" if it was developed predominantly for internal use and does not constitute "secret law" – that is, it does not purport to regulate conduct among members of the public or set standards to be followed by agency personnel in deciding whether to take actions affecting members of the public. See Crooker, 670 F.2d at 1073-74; Wiesenfelder v. Riley, 959 F. Supp. 532, 535 (D.D.C. 1997).

Applying this test to the issue before it, the Crooker court held that a Bureau of Alcohol, Tobacco and Firearms training manual on surveillance techniques was exempt from disclosure. Numerous other courts have held Exemption 2 applicable to various types of information (not just law enforcement manuals) that also tell employees how to do their jobs – information that relates to more substantive matters than conditions-of-employment "personnel" matters. See, e.g., Schiller, 964 F.2d at 1207-08 (holding documents containing NLRB litigation strategy exempt); Dirksen, 803 F.2d at 1458-59 (holding medicare policy guidelines, used by claims processing personnel, exempt); Hardy, 631 F.2d at 656-57 (holding document instructing ATF personnel in conducting raids and searches exempt); Caplan, 587 F.2d at 546-47 (same); Wiesenfelder, 959 F. Supp. at 536-37 (holding trigger figures, error rates and amounts of fines used by Department of Education employees to determine whether educational institutions are in compliance with Title IV exempt); Voinche, 940 F. Supp. at 328-29 (holding information relating to security of Supreme Court building and security procedures for Supreme Court justices exempt); Buffalo Evening News, Inc. v. U.S. Border Patrol, 791 F. Supp. 386, 390-93 (W.D.N.Y. 1992) (holding information collected on border patrol forms about illegal aliens exempt); Miller v. Department of Justice, Civ. A. No. 87-0533, 1989 WL 10598, at * 1-2 (D.D.C. Jan. 31, 1989) (holding prison security procedures exempt); Institute for Policy Studies

18

v. Department of the Air Force, 676 F. Supp. 3, 4-5 (D.D.C. 1987) (holding guide used by Air

Force personnel to classify documents exempt); Cuneo v. Laird, 338 F. Supp. 504, 506 (D.D.C.

1972) (holding manual instructing Defense Department personnel in auditing contractors

exempt). The proposition that Exemption 2 is limited to minor employment "personnel" matters

simply does not apply when disclosure would risk circumvention of the law.

B.     The Inundation Maps Meet The Test For Exempt "High 2" Information.

The inundation maps of the Hoover Dam and Glen Canyon Dam regions qualify as

exempt "high 2" information. They were developed and are used for predominantly internal

purposes, they relate to rules and practices for agency personnel, they involve no "secret law" of

the agency, and public disclosure would risk circumvention of the law. Crooker, 670 F.2d at

1073. Living Rivers concedes that the maps are "predominantly internal;" its argument instead is

that the maps do not relate to internal "personnel" rules or practices. (Plaintiff's Summary

Judgment brief at 7). But Living Rivers never explains why the maps do not relate to internal

personnel rules or practices, and its argument implicitly relies on the narrow conditions-of-

employment definition of "personnel" that the "high 2" cases have rejected. The most that Living

Rivers offers in terms of a rationale for its argument is that to consider the maps related to

internal personal matters would be to give Exemption 2 an impermissible "all-encompassing

sweep." (Id. at 6-7). However, not all information related to personnel rules and practices, no

matter how defined, is exempt under "high 2." The exemption is significantly bounded by the

requirements that information be developed and used for predominantly internal purposes, that it

not contain "secret law," and that disclosure risks circumvention of law. Crooker, 670 F.2d at

1073-74.

The inundation maps are predominantly internal because they were developed by BOR for BOR's use and are in fact used predominantly by BOR, and they do not contain any sort of "secret law." (Todd Declaration at ¶¶ 10-11). The fact that BOR shares the maps with state and local law enforcement officials in furtherance of BOR's responsibility for protecting Reclamation lands and facilities does not vitiate the maps' internality; what matters is that they are used for predominantly internal purposes, not to regulate the public's behavior. Crooker, 670 F.2d at 1073-74.

The maps also relate to internal rules and practices governing agency personnel. Id. The maps instruct BOR security personnel in how to carry out their jobs of protecting the dams and downstream communities from a catastrophic breach in the dams. BOR personnel use the maps to determine which areas are at risk of a breach in the dams, how much time it would take for at-risk areas to be flooded, and the level of protection required for dams given the potential for loss of life and property. BOR personnel utilize the maps to develop their own emergency response plans, to conduct emergency training exercises, and to coordinate with state and local law enforcement. (Todd Declaration at ¶¶ 6-8, 10-11, 27-28, 30). It is true that the maps do not relate to conditions of employment or trivial matters of employment relations, but that is not the test for "high 2." See, e.g., Crooker, 670 F.2d at 1056, 1073.

Disclosure of the maps would risk circumvention of the law for the same reasons discussed above under law enforcement Exemption 7. BOR determined that individuals intent on violating federal and state criminal laws via a terrorist attack could use the inundation maps both to identify Hoover Dam or Glen Canyon Dam as a target and to carry out their terrorist plans. In the hands of terrorists, the maps would be a blueprint of the damage and devastation for

the entire Colorado River system that a terrorist attack on the dams could cause. (Todd Declaration at ¶¶ 14-20). This judgment by BOR, based on its agency expertise, is plausible, reasonable, nonspeculative, and entitled to "substantial weight." 5 U.S.C. § 552(a)(4)(B). See also Buffalo Evening News, 791 F. Supp. at 393 (emphasizing that agency need not show actual circumvention of law, merely risk of circumvention of law).

Living Rivers' arguments that disclosure of the inundation maps would not risk circumvention of the law are unpersuasive. (Plaintiff's Summary Judgment brief at 7-9). First, Living Rivers argues that if circumvention of the law were really a risk, BOR would classify the maps or at least treat them in a confidential manner. Living Rivers' assertion that BOR carelessly releases the maps to law enforcement officers, making no provisions for their security, is both unsupported and mistaken. To the contrary, BOR treats the maps as sensitive, restricts access to those with a need to know, instructs those who view the maps to safeguard them and not disseminate them to the public, and only shares with law enforcement officials those sections of the maps that correspond to the officials' jurisdictions. (Todd Declaration at ¶¶ 22-26, 29). Moreover, withholding information on national security grounds pursuant to Exemption 2 is not inconsistent with the existence of FOIA's Exemption 1 for classified information. National security concerns are not the exclusive province of Exemption 1. See Institute for Policy Studies, 676 F. Supp. at 5 (rejecting argument that Exemption 2 is inappropriate for withholding unclassified national security information).

Second, Living Rivers contends that terrorists would have no use for the inundation maps since any terrorist would know that an attack on the dams would cause people to die, and since "knowledge of which specific areas would be flooded would not aid potential terrorists in

accomplishing their goal." (Plaintiff's Summary Judgment brief at 8). Living Rivers provides no basis for this supposition. Indeed, Living Rivers is not charged with possessing the expertise necessary to make such a sweeping assertion, and its speculation in this regard is entitled to little or no weight. See Gardels, 689 F.2d at 1106. BOR, on the other hand, has determined based on its substantial expertise that the inundation maps do in fact contain information, unknown to the public, that would assist terrorists in targeting the dams and carrying out a terrorist attack. (Todd Declaration at ¶¶ 14-21). It is highly unlikely that a terrorist would have an understanding, in the absence of viewing these maps, of which specific areas along the Colorado River would be flooded and which would not, and of how extensive the damage would be, of how quickly the damage would progress, and of how the damage compares to damage to be caused by attacking other potential targets of terrorism. Significantly, the inundation maps in and of themselves (as opposed to the Emergency Action Plans of which the maps are a part) provide all of this information that BOR reasonably believes is of interest to terrorists. (Id. at ¶¶ 21, 16-20).

Third, Living Rivers argues that the "high 2" exemption has been applied only to "agency manual[s] on how to screen for or detect violators of law," and since the inundation maps cannot be so characterized, they are not exempt under the "high 2" analysis. (Plaintiff's Summary Judgment brief at 9). Living Rivers' description of the law is underinclusive. As noted above, courts have upheld as exempt under "high 2" a wide variety of materials, with the common traits being that the materials related to rules or practices used by agency personnel to do their jobs, that they were developed and used primarily for internal agency purposes, and that their disclosure risked circumvention of law. See pages 18-19, supra. While courts have certainly withheld "agency manual[s] on how to screen for or detect violators of law," there is ample

support for withholding under Exemption 2 materials like the inundation maps that are used by agency personnel to protect persons or resources in furtherance of the agency's mandate, where the materials satisfy the "high 2" test. See Voinche, 940 F. Supp. at 328-29 (information relating to security of Supreme Court building and security procedures for Supreme Court justices); Miller, 1989 WL 10598, at * 1-2 (prison security procedures); Institute for Policy Studies, 676 F. Supp. at 4-5 (guide used by Air Force personnel to classify documents). The diversity of materials withheld under Exemption 2 demonstrates that the "high 2" interpretation is not restricted to documents that would, if disclosed, enable violators of the law to avoid detection.

C.     The Tenth Circuit Has Recognized The "High 2" Interpretation Of Exemption 2.

The Tenth Circuit has twice recognized the "high 2" approach but found it inapplicable to the facts before it. Audubon Society v. U.S. Forest Service, 104 F.3d 1201, 1203-04 (10th Cir. 1997) (finding maps of Mexican spotted owl nest sites in national forests not sufficiently related to internal personnel rules and practices); Hale, 973 F.2d at 902 (finding FBI information exempt under "low 2;" explaining that Exemption 2 "generally encompasses minor or trivial administrative matters of no genuine public interest and possibly more substantial matters that might be the subject of legitimate public interest if the disclosure of the latter might pose a risk of circumvention of lawful agency regulations," citing Rose).

Although purporting to apply Crooker's "high 2" test, the court in Audubon Society apparently applied the more constrained interpretation of "internal personnel rules and practices of an agency" appropriate in "low 2" cases. Rather than analyzing whether the owl nest site maps at issue in Audubon Society were predominantly internal and related to rules and practices governing agency personnel, as Crooker and other "high 2" cases instruct, the court simply

23

concluded, without analysis, that it was too much of a stretch to find that the nest site maps related to the internal personnel practices of the Forest Service. Audubon Society, 104 F.3d at 1204. The court's analysis was focused instead on the Forest Service's argument that the phrase "internal personnel" modified only "rules" and not "practices" so that it did not have to show that the nest site maps related to personnel practices of the agency. The court rejected this argument and then summarily concluded that the nest site maps did not relate to personnel practices of the Forest Service, without considering the expansive meaning given to "personnel rules and practices" by the "high 2" case law which the court was supposed to be applying. Id.

In any event, the nest site maps in Audubon Society are distinguishable from the instant inundation maps, despite the superficial fact that both concern "maps." The maps in Audubon Society merely showed the locations of owl nests. The only agency "rule" or "practice" that they related to was the practice of identifying and documenting such information, which implicates the concern that Exemption 2 would sweep too broadly if the nest site maps were withheld. See Maricopa Audubon Society v. U.S. Forest Service, 108 F.3d 1082, 1086 (9th Cir. 1997); Audubon Society, 104 F.3d at 1204; Schwaner v. Department of the Air Force, 898 F.2d 793, 795-96 (D.C. Cir. 1990). In contrast, the inundation maps concern, in Living Rivers' own words, BOR's "substantive dam-management duties." (Plaintiff's Summary Judgment brief at 6). The inundation maps are an integral part of BOR's Emergency Action Plan for each dam and therefore represent the processes followed by BOR personnel in protecting the dams and downstream communities in emergency situations. (Todd Declaration at ¶ 8). Information about exactly which communities would be flooded, which power plants would be affected, etc., is fundamental to BOR's and state, local and tribal law enforcement authorities' development and

implementation of emergency response plans. Identifying where to direct emergency resources is the initial step in the process of protecting public safety in the event of a dam failure. (Id. at ¶¶ 6-8, 10-11, 27-28, 30).

Additionally, information about the amount of damage associated with a massive failure of each dam under BOR's jurisdiction is critical to allow BOR personnel to make informed decisions about the amount of security resources to allocate to each dam, and, consequently, reveals information about where BOR's security resources are allocated. In Mr. Todd's words, "the inundation maps are a key element in allowing the BOR to determine the risks at various dams and to set priorities in addressing issues of dam safety." (Id. at ¶10). The inundation maps relate to BOR's practices of protecting the dam regions and preventing attacks, they are not just related to the "practice" of collecting information. Cf. Maricopa Audubon Society, 108 F.3d at 1086; Schwaner, 898 F.2d at 795-96. The inundation maps shed "significant light" on the processes and practices of BOR personnel, warranting their protection from disclosure under Exemption 2. Maricopa Audubon Society, 108 F.3d at 1086 (quoting Schwaner, 898 F.2d at 797).

The Tenth Circuit's treatment of the "high 2" approach in Audubon Society and Hale suggests that it would expressly adopt it in an appropriate case. Indeed, the Tenth Circuit in Audubon Society attempted to apply a "high 2" analysis. Audubon Society, 104 F.3d at 1204. The "high 2" approach finds its genesis in Supreme Court case law, and the Second, Seventh, Ninth and D.C. circuits have all explicitly adopted it.[5] See Rose, 425 U.S. at 364-65, 369-70;

---

[5]The Courts of Appeals for the First, Third, Fourth and Eleventh Circuits have not addressed the subject, but district courts in all of those circuits except the Third have applied the "high 2" analysis (no district courts in the Third Circuit have, to our knowledge, addressed the

Kaganove v. Environmental Protection Agency, 856 F.2d 884 (7th Cir. 1988), cert. denied, 488 U.S. 1011 (1989); Dirksen, 803 F.2d at 1458; Hardy, 631 F.2d at 656; Caplan, 587 F.2d at 547.

The cases that Living Rivers cites for the proposition that the Fifth and Sixth circuits have rejected the "high 2" approach were decided in the early 1970s, before the Supreme Court implicitly gave a nod of approval to the theory in Rose and before the D.C. Circuit issued its seminal Crooker decision. See Plaintiff's Summary Judgment brief at 11-12, citing Stokes v. Brennan, 476 F.2d 699 (5th Cir. 1973); Hawkes v. Internal Revenue Service, 467 F.2d 787 (6th Cir. 1972). In fact, the Fifth Circuit has not addressed Exemption 2's applicability where disclosure of requested materials would risk circumvention of law, so it too has apparently not been squarely faced with the opportunity to adopt the "high 2" approach. See Sladek v. Bensinger, 605 F.2d 899, 901-02 (5th Cir. 1979) (concluding that disclosure of portions of DEA manual dealing with procedures for handling informants' statements and publicly known procedures for obtaining search warrants would not impede law enforcement efforts); Stokes, 476 F.2d at 702 (finding that disclosure of training manual for Occupational Safety and Health Administration inspectors would not help employers avoid compliance with OSHA regulations). District courts have nonetheless found that Fifth Circuit case law supports the "high 2" approach. See Wilder, 601 F. Supp. at 242-43; Savoie v. Internal Revenue Service, 544 F. Supp. 662, 667 (W.D. La. 1982). Similarly, the Sixth Circuit case cited by Living Rivers, Hawkes, 467 F.2d

---

subject either). See Beckette v. U.S. Postal Service, Civ. A. No. 90-1246-N, 1993 WL 730711, at * 3-4 (E.D. Va. Mar. 11, 1993); Commonwealth of Massachusetts v. U.S. Dept. of Health and Human Services, 727 F. Supp. 35, 39-40 (D. Mass. 1989); Wilder v. Commissioner of Internal Revenue, 607 F. Supp. 1013, 1015, 1016 (M.D. Ala. 1985); Wilder v. Commissioner of Internal Revenue, 601 F. Supp. 241, 242-43 (M.D. Ala. 1984); Goldsborough v. Internal Revenue Service, Civil No. Y-81-1939, 1984 WL 612, at * 8 (D. Md. May 10, 1984).

787, was decided before <u>Rose</u> and before the formalization of the "high 2" analysis, and more

recent case law demonstrates the adoption of the "high 2" analysis in the Sixth Circuit. <u>See</u>

<u>Abraham & Rose P.L.C. v. United States</u>, 138 F.2d 1075, 1080-82 (6th Cir. 1998) (applying

"high 2" analysis but finding it inapplicable because requested database only signified agency

practice of compiling and collecting information); <u>Tickel v. Internal Revenue Service</u>, No. Civ-1-

85-709, 1986 WL 14436, at * 2 (E.D. Tenn. Aug. 22, 1986) (adopting <u>Crooker</u>'s interpretation of

Exemption 2); <u>Hobart Corp. v. Equal Employment Opportunity Commission</u>, 603 F. Supp. 1431,

1450-51 (S.D. Ohio 1984) (concluding that application of Exemption 2 in Sixth Circuit should be

guided by <u>Crooker</u>'s test), <u>vacated</u>, 716 F. Supp. 307 (S.D. Ohio 1985).[6]

Finally, Living Rivers correctly notes that Congress codified <u>Crooker</u> into Exemption 7

when it amended FOIA in 1986, but incorrectly derives from this act the conclusion that

"Congress plainly did not agree with a broad 'high 2' exemption that would apply outside the

context of law enforcement manuals." (Plaintiff's Summary Judgment brief at 12-13). Living

Rivers fails to support this hypothesis with any reasoning or case law. In fact, in the very case

cited by Living Rivers for the proposition that Congress codified <u>Crooker</u> in the Freedom of

Information Reform Act of 1986, the Seventh Circuit reached the opposite conclusion about its

---

[6]<u>Cox v. Department of Justice</u>, 576 F.2d 1302, 1309-10 (8th Cir. 1978), also cited by
Living Rivers, was decided two years after <u>Rose</u> but before <u>Crooker</u>. The Eighth Circuit held
that portions of a DEA agents' manual, the disclosure of which would have risked circumvention
of law, were not protected under Exemption 2. The court opted for the Senate report's narrow
interpretation of Exemption 2, purporting to follow <u>Rose</u> but clearly missing the aspects of <u>Rose</u>
in which the Supreme Court recognized the import of the House report to materials which, if
disclosed, would risk circumvention of law, and in which the Supreme Court explicitly reserved
ruling on Exemption 2's applicability to such materials. The Eighth Circuit, however, stands
alone in its interpretation of Exemption 2, and there is no reason to believe that the Tenth Circuit
would follow suit.

meaning: "Because Congress saw fit to codify the very language of <u>Crooker</u>, and because nothing in the legislative history of the Reform Act suggests the slightest disagreement with that case's holding, we believe that <u>Crooker</u> accurately expresses congressional intentions." <u>Kaganove</u>, 856 F.2d at 889. Application of the "high 2" analysis is therefore consistent with Congressional intent, the law of the Tenth Circuit and the law of the overwhelming majority of federal courts.

## **CONCLUSION**

For all the foregoing reasons, defendant Bureau of Reclamation respectfully requests that the Court deny plaintiff Living Rivers' motion for summary judgment, grant BOR's cross-motion for summary judgment, and enter judgment in favor of defendant Bureau of Reclamation on the grounds that the requested inundation maps are exempt from disclosure under FOIA.

OF COUNSEL:                          Respectfully submitted,


CARLIE CHRISTENSEN                   Robert D. McCallum, Jr.
Assistant U.S. Attorney              Assistant Attorney General

ROBERT MOLL                          Paul M. Warner
ROBIN FRIEDMAN                       United States Attorney, District of Utah
Division of General Law
Department of Interior               Elizabeth J. Shapiro, Assistant Branch Director
                                     U.S. Department of Justice, Civil Division
                                     Federal Programs Branch


                                     *Marcia Berm*

                                     MARCIA BERMAN, PA Bar No. 66168
                                     U.S. Department of Justice, Civil Division
                                     901 E Street, N.W., Room 1043
                                     Washington, D.C. 20530
                                     Tel: (202) 514-3330
                                     Fax: (202) 616-8470

                                     *Attorneys for Defendant United States Bureau
                                     of Reclamation*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2002, true and correct copies of the foregoing Cross-Motion for Summary Judgment of Defendant United States Bureau of Reclamation and Memorandum of Law in Support of Defendant United States Bureau of Reclamation's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, with Exhibits, were served by first class mail, postage prepaid, on counsel for plaintiff at the addresses listed below:

Matt Kenna
679 E. 2nd Ave., Suite 11B
Durango, CO 81301

Joro Walker
Land and Water Fund of the Rockies
1473 South 1100 East, Suite "F"
Salt Lake City, Utah 84105

Marcia Berman

Exhibits/
Attachments
to this document
have **not** been
scanned.

Please see the
case file.