FILED
-9 DEC 02 AM 9:39
DISTRICT OF UTAH
BY:_____
DEPUTY CLERK

Matt Kenna
Kenna & Hickcox, P.C.
679 E. 2nd Ave., Suite 11 B
Durango, CO 81301
Phone: (970) 385-6941
*Pro Hac Vice*

Joro Walker USB #6676
Director, Utah Office
Land and Water Fund of the Rockies
1473 South 1100 East, Suite "F"
Salt Lake City, UT 84105
Phone: (801) 487-9911

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LIVING RIVERS, INC., a non-profit, Utah corporation;    ) )  Plaintiff,     ) ) vs.     ) ) UNITED STATES BUREAU OF RECLAMATION,     ) ) Defendant.     ) ) | Case No. 2:02CV0644TC  PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |

Plaintiff now submits its response to defendant's cross-motion for summary judgment.

16

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

COUNTER-STATEMENT OF MATERIAL FACTS ............................................................ 2

I.    EXEMPTION 7 DOES NOT APPLY ...................................................................... 2

    A.    The Inundation Maps Are Not "Information Compiled for Law
        Enforcement Purposes" ................................................................................. 2

    B.    The Inundation Maps Do Not "Disclose Guidelines for Law
        Enforcement Investigations or Prosecutions" under Exemption 7(E) ................ 6

    C.    Release of the Inundation Maps Would Not "Endanger the Life or
        Physical Safety of Any Individual" under Exemption 7(F) .............................. 8

II.   EXEMPTION 3 DOES NOT APPLY ...................................................................... 9

III.  EXEMPTION 2 DOES NOT APPLY ...................................................................... 10

    A.    The Court May Not Abandon Binding Tenth Circuit Precedent in
        Determining the Applicable Standard for Applying Exemption 2 ..................... 10

    B.    The Inundation Maps Do Not Relate to the "Internal Personnel
        Rules and Practices" of the Bureau ............................................................... 12

    C.    The Inundation Maps Would Not Risk Circumvention of Law ......................... 13

    D.    The "High 2" Exemption Should Be Rejected ............................................... 15

CONCLUSION ............................................................................................................... 18

**INTRODUCTION**

The defendant United States Bureau of Reclamation ("the Bureau"), obviously recognizing that its claim of Exemption 2 is not compelling, has now for the first time, despite two earlier opportunities in responding to Living Rivers' document request, claimed two other exemptions under the Freedom of Information Act ("FOIA") in addition to Exemption 2. However, none of these exemptions apply to the inundation maps.

The biggest concern in this case is whether, as a practical matter, release of the maps would increase the risk of attack on Glen Canyon and Hoover dams. However, the Bureau's motion has not actually shown that releasing the inundation maps would do this. The information might give a potential "terrorist information about the amount of damage that could be caused by destroying a dam." BOR Exh. 3 at 6 ¶ 16. The inundation maps simply would not, however, aid in actually carrying out an attack or help a perpetrator evade apprehension. In contrast, making this information available actually helps people who live in the affected areas, by allowing them to be adequately prepared, or to make choices about where they live, where they build etc., in the event of a dam breach, however one might be caused.

Further, the Bureau has admitted that the maps are given to local law enforcement and various unidentified "other entities"- and that is why they have not been classified in order to be exempt under the national security exemption of Exemption 1. See BOR Exh. 3 at 9 ¶ 26; see Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 863 (D.C. Cir. 1980) (FOIA exemption not shown where agency has not identified with specificity "who has had access to the documents."). While the Bureau has shown that the agency itself has certain safeguards in place, no showing has been made regarding the manner that local law enforcement or these "other entities" might keep the maps secure.

The public deserves to have this information which is simply not secure anyway.

In the end, however, weighing these public policy determinations is not a job the Court need undertake, as the maps simply do not fit within any exemption under FOIA.

## COUNTER-STATEMENT OF MATERIAL FACTS

Living Rivers agrees there are no disputes as to material facts in this case. However, for the reasons explained herein, Living Rivers denies that the Bureau has carried its burden as a matter of law under FOIA to show that the "information in the maps could be used by potential terrorists to plan the means and manner of attacking the dam system to maximize the harm both to the system and to the surrounding communities." See BOR Brf. at 2 (lines 10-12).

## I.    EXEMPTION 7 DOES NOT APPLY

The Bureau has invoked Exemptions 7(E) and (F), which exempt "information compiled for law enforcement purposes," the release of which would "disclose guidelines for law enforcement investigations or prosecutions" or "could reasonably be expected to endangered the life or safety of any individual." 5 U.S.C. § 552(b)(7)(E),(F). However, the inundation maps are not "information compiled for law enforcement purposes," so neither Exemption (7)(F) nor (7)(E) apply. Nor are the individual tests for each sub-exemption applicable here.

### A.    The Inundation Maps Are Not "Information Compiled for Law Enforcement Purposes"

The first step in determining whether these exemptions apply is to determine whether the threshold test of Exemption 7 has been met, namely that the documents must contain "information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). If this threshold test is not met, the particular tests of sub-sections (E) and (F) need not be examined, as they can not apply. Pratt v.

2

Webster, 673 F.2d 408, 416 (D.C. Cir.1982).

In analyzing the application of Exemption 7, it is important to distinguish between per se law enforcement agencies such as the FBI, and "mixed function" agencies whose primary mission is not law enforcement. Tax Analysts v. IRS, 294 F.3d 71, 77 (D.C. Cir 2002) (reh'g en banc denied). The "courts apply a more deferential standard to a claim that information was compiled for law enforcement purposes when the claim is made by an agency whose primary function involves law enforcement." Id. As the Bureau concedes and as is plain, it is a "mixed function" agency. BOR Brf. at 6.

> [T]he assumption that a mixed-function agency is acting within the scope of its authority tells a court nothing about whether it has met the Exemption 7 threshold requirement of a "law enforcement purpose." Law enforcement, indeed, is often one of such an agency's proper functions, but other functions are also a major part of the agency's day-to-day business. Thus, a court must scrutinize with some skepticism the particular purpose claimed for disputed documents redacted under FOIA Exemption 7.... If courts accept a mixed-function agency's claims of "law enforcement purpose" without thoughtful consideration, the excessive withholding of agency records which Congress denounced and sought to avoid ... might well result.

Pratt v. Webster, supra, at 418.

Sweeping the inundation maps into the purview of Exemption 7 is exactly the type of "excessive withholding" Congress did not intend. "It is clear that, under the amended threshold of Exemption 7, an agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation." Tax Analysts, supra, at 79 (citation omitted). The problem here is that we are not dealing with law enforcement manuals, sources, or anything else that meets the common-sense notion of law enforcement materials. Rather, the inundation maps are compiled as part of the Bureau's primary

administrative functions, namely management of the dams.

As the agency itself admits, the maps were prepared "[a]s part of the BOR's ongoing operations" concerning its "'substantive dam-management duties.'" BOR Exh. 3 at 3 ¶ 6; BOR Brf. at 24 (quoting Living Rivers' brief). As the Court of Appeals has stated, the courts must reject an application of any FOIA exemption which "would give the exemption an 'all-encompassing sweep' that would cover virtually all material published by the" federal agencies. Audubon Society v. U.S. Forest Service, 104 F.3d 1201, 1204 (10th Cir. 1997) (pet. for rehearing denied) (citation omitted). It may be that the maps are used in law enforcement, but that is no different than when police may use information regarding hospitals, medical personnel and ambulance service to prepare for potential emergency. Under the Bureau's argument, any document that could be used by law enforcement at some point would be exempt under FOIA, which would sweep much too broadly.

The cases cited by the Bureau show this to be true. First, all of the cases involve per se law enforcement agencies, not "mixed function" agencies such as the Bureau. See BOR Brf. at 8-9. As discussed, such agencies get wide latitude in their claims of exemption for documents used for law enforcement purposes, as that is the entire role of agencies such as the Secret Service and the FBI. However, here the Court must employ "skepticism" in examining the Bureau's claim. Pratt v. Webster, supra, at 418. Compare U.S. News & World Report v. Dept. of the Treasury, Civ. Action No. 84-2303, 1986 U.S. Dist. LEXIS 27634, at *5 (D. D.C. Mar. 26, 1986) (cited in BOR Brf. at 8) ("'An agency which has a clear law enforcement mandate [such as the defendant Secret Service] . . . need only establish a 'rational nexus' between enforcement of a federal law and the document for which an exemption is claimed.'") (citing, inter alia, Pratt v. Webster, supra, at 420).

4

Not only do the cases cited by the Bureau concern per se law enforcement agencies, but the documents withheld were unlike the maps sought here. In Moorefield v. U.S. Secret Service, the documents at issue concerned "investigative matter that assists the Service in its efforts to keep track of Moorefield and preclude his harming a Service protectee.  As the Service affidavit pointed out, disclosure of these materials could tend generally to inform targets of Service investigations of the means the Service employs to keep abreast of them, and, specifically, to enable Moorefield to elude the scrutiny of the Service . . .." 611 F.2d 1021, 1026 (5th Cir.), cert. denied, 449 U.S. 909 (1980). The inundation maps are nothing like such materials.

The maps are further unlike the "security programs" at issue in United States v. Eastern Air Lines, Inc., 792 F.2d 1560 (11th Cir. 1986) (which was not even a FOIA case and made no finding as to whether the programs could be withheld under FOIA ); are unlike the "Foreign Affairs Manual" "containing methods for identifying and notifying Secret Service of individuals who may pose threats to government officials" at issue in Zamnik v. Dept. of State, Civ. Act. No. 79-1072 (D. D.C. 1979); and unlike the documents pertaining to the relocation of a witness in Liberach v. FBI, 587 F.2d 372, 373 (8th Cir. 1978), cert, denied, 440 U.S. 910 (1979). See BOR Brf. at 9.  In order to qualify as law enforcement materials, "they must involve the detection or punishment of violations of law." Allnutt v. Dep't of Justice, 99 F. Supp. 2d 673, 680 (D. Md. 2000), citing Freeman v. U.S. Dep't of Justice, 723 F. Supp. 1115, 1122-23 (D. Md.1988); Ortiz v. United States Dep't of Health and Human Serv., 70 F.3d 729, 732-33 (2d Cir.1995);  Malizia v. U.S. Dep't of Justice, 519 F. Supp. 338, 347 (D.C.N.Y.1981).  The inundation maps simply do not do this.

The best case for the Bureau is the unreported decision in U.S. News & World Report, supra, in which the Secret Service was permitted to withhold information pertaining to the armored

limousines it ordered for use by the President. See BOR Brf. at 8. First, however, it is important to note that the Secret Service is a per se law enforcement agency. This case appears to mark the outer limits of withheld documents under Exemption 7, and while that might be permissible for a per se law enforcement agency under the "rational basis" standard, it certainly should not be extended here to a mixed-function agency under the "skeptical" standard applicable to such agencies. See Pratt v. Webster, supra, at 418.

Further, the limousine "specifications" sought there were gathered by the Secret Service as part of it mandate of preventing harm to the President. U.S. News at *3-*4. Here, however, the role of the maps is not to prevent a breach of the dams. Rather, the maps only predict the result of dam breach. As such, they are simply not documents compiled for "law enforcement purposes." For these reasons, the threshold test of Exemption 7 does not apply, and the individual tests of 7(E) and 7(F) need not be determined. However, as will be shown, even if the threshold test of Exemption 7 were met, the individual tests of sub-sections (E) and (F) are not.

### B.    The Inundation Maps Do Not "Disclose Guidelines for Law Enforcement Investigations or Prosecutions" under Exemption 7(E)

As discussed by Living Rivers and acknowledged by the Bureau, the relevant provision of Exemption 7(E) was merely a codification of the "High 2" exemption as applied by Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, (D.C. Cir. 1981) (en banc) to law enforcement manuals. LR Brf. at 11; BOR Brf. at 27. For this reason, much of Living Rivers' discussion of the High 2 exemption in its opening brief is applicable here. However, there is an even more compelling reason that Exemption 7(E) does not apply.

The Bureau argues why releasing the maps would "risk circumvention of law." BOR Brf. at 10-11. However, the Bureau fails to explain how the inundation maps qualify as "techniques and procedures . . .or would disclose guidelines for law enforcement investigations or prosecutions" necessary to invoke the "circumvention of law" exemption of 5 U.S.C. § 552(b)(7)(E). Thus, even if release of the maps did risk "circumvention of law,"[1] the exemption would still not apply because we are simply not dealing with manuals containing law enforcement guidelines, as in Crooker, to which the exemption applies.

The cases cited by the Bureau show that the inundation maps do not meet this standard. See BOR Brf. at 10-11. Hale v. U.S. Dept. of Justice involved "information regarding investigative techniques and procedures, security devices and modus operandi, and polygraph matters. 973 F.2d 894, 903 (10th Cir. 1992), vacated on other grounds, 509 U.S. 918 (1993). Librach v. FBI merely stated in a conclusory manner that documents which "pertain to the relocation of a witness under the Department of Justice Witness Security Program" could be withheld under "exemptions 5 U.S.C. s 552(b)(3), (7)(C) and (E)." 587 F.2d 372, 373 (8th Cir. 1978) cert. denied 440 U.S. 910 (1979). Such a statement hardly provides support for the Bureau's position here.

The Bureau again cites U.S. News, supra. This case should not be applied here for the reasons discussed above pertaining to the threshold test of Exemption 7, but should also not be followed regarding sub-section (E). That court threw out the language of Exemption 7(E), rejecting plaintiffs' attempt to enforce it as "wooden," in favor of an expansivist approach. Id. at *7. However, that is not the proper method for interpreting FOIA exemptions. Rather, because "FOIA is to be

---

[1]. Living Rivers discusses in sections I.C. and III.C. of this brief why release of the maps would not risk circumvention of law, and are incorporated in this section by reference.

broadly construed in favor of disclosure, and its exemptions are to be narrowly construed, . . . we must initially determine whether the maps 'fall within the terms of the statutory language.'" Audubon Society at 1203-04 (citations omitted).

In short, "[i]t stretches the language of the exemption too far to conclude that" the inundation maps would disclose law enforcement techniques, procedures or guidelines, and so Exemption 7(E) does not apply. See Audubon Society, supra, at 1204.

### C.    Release of the Inundation Maps Would Not "Endanger the Life or Physical Safety of Any Individual" under Exemption 7(F)

The Bureau has not shown that release of the maps would actually lead to an increased risk of attack on the dams, and so has not shown that release of the maps would "endanger the life or physical safety of any individual" as required by Exemption 7(F). 5 U.S.C. § 552(b)(7)(F). However, Living Rivers suggests that the Court may wish to order the Bureau to submit the maps in camera to aid it in its decision. See EPA v. Mink, 410 U.S. 73, 93 (1973); Center for Auto Safety v. EPA, 731 F.2d 16, 20-22 (D.C. Cir. 1984) (courts have broad discretion to order in camera review). If the Court were to determine that release of certain portions of the maps risk harm to the dams, it should order only those portions redacted. See id. 731 F.2d at 20, citing inter alia 5 U.S.C. § 522(b) (final ¶) ("any reasonably segregable portion" of a document must be provided if the document contains exempt material).

Certainly, if Living Rivers were requesting dam schematics which allowed terrorists to identify vulnerable portions of the dam, or similar information, the documents would meet this prong of Exemption 7(F). But that is not the case. Rather, Living Rivers has only requested the inundation maps, to show which areas would be flooded if the dams were breached. While this information

might give a potential "terrorist information about the amount of damage that could be caused by destroying a dam," the information would not actually increase the likelihood or ease or an attack. See BOR Exh. 3 at 6 ¶ 16. The only pieces of information contained in the maps which the Bureau alleges could be used in aid of an attack are "flood travel times and water depths," which the Bureau alleges could be used "to help plan and execute sequenced attacks." Id. at 7 ¶ 18. Living Rivers is not opposed to redacting such information. However, the maps generally, which show the areas that would be flooded, simply do not increase the likelihood or ease of an attack, and can not be withheld. The people who live in the areas that would be flooded can be helped by this information, by making choices about whether to live there, where to build, and/or how to be ready for an emergency. Providing this limited information to the public would actually help protect "the life or physical safety" of the local residents, rather than "endanger" it. See 5 U.S.C. § 552(b)(7)(F).

For these reasons, neither Exemption 7(E) or 7(F) allows the Bureau to withhold the maps, at least not with redactions to remove any reference material that would actually aid in carrying out a terrorist attack.

II.    **EXEMPTION 3 DOES NOT APPLY**

The Service also claims for the first time that the inundation maps may be withheld under Exemption 3, which allows the withholding of documents where such withholding is authorized by another statute. See 5 U.S.C. § 552(b)(3). This argument is a non-starter.

The Bureau seeks to apply the National Historic Preservation Act, which provides that "[t]he head of a federal agency . . ., after consultation with the Secretary [of Interior], shall withhold information  about the location, character, or ownership of a historic resource if the Secretary and the agency determine that disclosure may . . . (2) risk harm to the historic resource . . .." BOR Brf.

at 13-14, citing 16 U.S.C. § 470w-3(a). However, the statute's plain meaning shows that it was not designed for this circumstance.

Contrary to the conclusory assertion of the Bureau, the inundation maps do not reveal anything about the "character" of the dams, such as revealing that the window panes of an historic house are made of gold and covered by paint, which revelation could lead to theft. See BOR Brf. at 14. Once again, the Bureau seeks to stretch statutory language beyond its breaking point. Further, as discussed above in the context of Exemption 7(F), release of the inundation maps would not risk harm to the dams even if the "character" test were met. For these reasons, Exemption 3 does not apply.

## III.   EXEMPTION 2 DOES NOT APPLY

Rather than show that the inundation maps meet the two-part test applicable to Exemption 2 announced by the Tenth Circuit, and seek to apply them sequentially, the Bureau invites this Court to abandon binding precedent, and other wise mixes up the tests so that the "circumvention of law" test overshadows the whole application of the exemption. See BOR Brf. at 19 (heading arguing that "The Inundation Maps Meet The Test For Exempt 'High 2' Information.") (emphasis added). However, this is not the proper approach, and the Bureau's application of Exemption 2 should be rejected.

### A.   The Court May Not Abandon Binding Tenth Circuit Precedent in Determining the Applicable Standard for Applying Exemption 2

The Bureau suggests that the Court of Appeals got it wrong in Audubon Society, supra, and implies that this Court should ignore it in formulating the applicable test for Exemption 2. BOR Brf. at 23-24. However, this Court may of course not do this, and the Court of Appeals announced the

proper test in that case.

As the Court of Appeals stated: "Under the 'high 2' approach, adopted in four circuits, government information is exempted if:  (1) the information falls within the language of the exemption-- that is, it relates to the 'internal personnel rules and practices' of the agency and is 'predominantly internal';  and (2) its disclosure would risk circumvention of federal statutes or regulations." Audubon Society at 1203-04.  Under the Bureau's argument, the Court should ignore this holding and the explicit language of the statute, and merely employ a "predominantly internal" test under the first prong of the High 2 exemption.  However, that would be in error.

The Bureau appears to argue that the Court of Appeals announced its standard by mistake. However, the applicable standard was thoroughly raised in that appeal.  After losing its case in the district court, on appeal the government argued that the "predominantly internal" test only should be applied in lieu of applying the language of Exemption 2. Exh. G at 29.[2]  In response, the Audubon Society pointed out that since the time of Crooker, the threshold test of the High 2 exemption has evolved from only the "predominantly internal" test of Crooker to whether "'the material withheld [falls] within the terms of the statutory language as a personnel rule or internal practice of the agency.'" Exh. H at 15-16.[3]  The Court, being fully apprized by the parties, chose the modern test

---

[2] .  Exhibits G and H are attached to this brief.

[3] .  As noted in the Audubon Society brief, the test has received different formulations in different courts: it was initially described as whether the subject information was "predominantly internal."  Crooker, supra, at 1074.  However, that test is only sufficient where an actual rule or description of a practice is involved, and where only the matter of internality (i.e., predominantly a personnel matter) is left.  In order to address all potential documents and all parts of the statutory language, a more encompassing test has arisen in the D.C. Circuit since the time of Crooker, whereby the threshold test is that "the material withheld should fall within the terms of the statutory language as a personnel rule or internal practice of the agency." Schwaner v. Dept. of Air Force, 898 F.2d 793,

pointed out by the Audubon Society.  The Bureau might not like this result, but it is the law of the Circuit.

**B.     The Inundation Maps Do Not Relate to the "Internal Personnel Rules and Practices" of the Bureau**

As discussed, the Court of Appeals requires that an agency seeking to withhold information under Exemption 2 must show that "the information falls within the language of the exemption-- that is, it relates to the 'internal personnel rules and practices' of the agency and is 'predominantly internal.'" <u>Audubon Society</u> at 1203.  This test has not been met here.

The Bureau argues that the maps "relate to internal rules and practices governing agency personnel," because "[t]he maps instruct BOR security personnel in how to carry out their jobs . . .." BOR Brf. at 20.  However, the test is not whether the maps "relate to internal rules and practices governing agency personnel," which would exempt any document concerning the carrying out of substantive agency duties by agency staff.  This was exactly the approach rejected in <u>Audubon Society</u>:

> The Forest Service argues that the maps are related to agency practices because they assist Forest Service personnel in their management duties.  We note first that the Forest Service errs by referring to "agency practices."  The phrase "internal personnel rules" and "practices of an agency" should not be read disjunctively; "internal personnel" modifies both "rules" and "practices." <u>See</u> <u>Jordan v. United States Dep't of Justice</u>, 591 F.2d 753, 764 (D.C. Cir. 1978). The predecessor of Exemption 2 allowed the withholding of "any matter relating solely to the internal management of an agency," 5 U.S.C. § 1002 (1964), quoted in <u>Jordan</u>, 591 F.2d at 764, which in Congress' judgment was far too broad.  Thus, Congress enacted the new Exemption 2 to narrow the "internal management" exemption.  See H.R.Rep. No. 89-1497 (1966), reprinted in 1966 U.S.C.C.A.N. 2418, 2422-23.  Therefore, the proper inquiry is not whether the owl maps relate to the "agency practices," but whether they relate to the "personnel practices" of the Forest Service.

794-95 (D.C. Cir. 1990), <u>citing</u> <u>Founding Church of Scientology, Washington, D.C. v. Smith</u>, 721 F.2d 828, 830 n.4 (D.C. Cir. 1983).

<u>Audubon Society</u> at 1204.  The maps simply having nothing to do with personnel rules or practices.

The maps do not "instruct BOR security personnel in how to carry out their jobs . . .."  <u>See</u> BOR Brf. at 20.  Certainly, the information contained in the maps is <u>used</u> by BOR personnel in carrying out their jobs, just as every agency document is used by agency personnel.  But the maps provide no <u>instructions</u>, or otherwise contain "rules or practices" such as the law enforcement manuals typically withheld under the High 2 interpretation of Exemption 2.  Further, they do not "relate" to any rules or practices in any direct or meaningful sense.  Again, as stated by the Court of Appeals:

> It stretches the language of the exemption too far to conclude that owl maps "relate" to personnel practices of the Forest Service.  The Forest Service's argument raises the concern expressed in Vaughn v. Rosen, 523 F.2d 1136 (D.C. Cir.1975):
>> In some attenuated sense, virtually everything that goes on in the Federal Government,  and much that goes on outside of it, could be said to be "related" through some chain of circumstances to the "internal personnel rules and practices of an agency."  The potentially all-encompassing sweep of a broad exemption of this type [would] undercut[] the vitality of any such approach.
> Id. at 1150 (Leventhal, J., concurring).  The Forest Service's argument would give the exemption an "all-encompassing sweep" that would cover virtually all material published by the Forest Service.  We agree with the district court that even if we were to adopt the high 2 analysis, the maps are not sufficiently "related to internal personnel rules and practices" and would therefore fail the first prong.  Thus, we need not address the Forest Service's argument that disclosure of the maps risks circumvention of the Endangered Species Act.

<u>Audubon Society</u> at 1204.  Likewise here, simply because personnel use the maps does not mean that the maps relate to a personnel rule or practice.  The maps do not meet this test.

**C.      The Inundation Maps Would Not Risk Circumvention of Law**

The second prong of the High 2 interpretation of Exemption 2 that an agency must show for a withheld document is that "its disclosure would risk circumvention of federal statutes or regulations." <u>Audubon Society</u> at 1203-04.  However, the Bureau has failed to meet this showing,

which is not satisfied by merely showing that release of the documents would lead to an increased risk of violation of law. Rather, the documents must actually "'hinder investigations [and] enable violators to avoid detection.'" Dirksen v. United States Dept. of Health & Human Services, 803 F.2d 1456, 1458 (9th Cir. 1986), citing Caplan v. Bureau of Alcohol, Tobacco & Firearms, 587 F.2d 544, 545 (2nd Cir. 1978).

The Bureau argues this standard is "underinclusive," but it once again can not avoid that this is the law governing this prong of the test. See BOR Brf. at 22. As the Ninth Circuit stated in the companion case to Audubon Society: "The requested information does not tell the [agency] how to catch lawbreakers;  nor does it tell lawbreakers how to avoid the [agency]'s enforcement efforts." Maricopa Audubon Society v. Forest Service, 108 F.3d 1082, 1087 (9th Cir. 1997).

The cases cited by the Bureau are not to the contrary. See BOR Brf. at 23. Voinche v. FBI involved "permanent confidential source symbol numbers, file numbers, and certain manuals containing detailed discussions regarding techniques used by professional gamblers to evade prosecution. [] In addition, the FBI withheld information relating to the security of the Supreme Court building and the security procedures for Supreme Court Justices." 940 F. Supp. 323, 328-29 (D. D.C. 1996) (record citations omitted), aff'd 1997 WL 411685 (D.C. Cir. June 19, 1997), cert. denied 522 U.S. 950 (1997). In Miller v. DOJ, the court held that documents, which contained

> internal procedures for security of prison control centers, including chemical spray (mace-type) dispensers for controlling dangerously violent inmates;  riot control procedures;  escape prevention and apprehension plans;  control of keys and locks within the prison;  control of flammable, hazardous and poisonous materials and chemicals;  searches of offenders;  security safeguards and precautions employed at the front and rear entrances;  minimum requirements and standards for taking accurate inmate population counts, to insure security and strict accountability;  transportation of federal offenders;  instructions regarding the operation of BOP buses;  arms, restraining and controlling equipment, and communications equipment carried by correctional personnel;  and the arms and defensive equipment inventory which

14

> details the type, manufacturer and nomenclature for firearms, chemical agents, communication equipment, detection equipment and defensive equipment

should be exempt because

> release of the information would necessarily facilitate efforts by inmates to frustrate the Bureau's security precautions. (Jackson Declaration p 13) ("If this information is released, inmates could devise plans to avoid detection and apprehension when organizing an escape or disturbance, and would know how to thwart BOP procedures to prevent or quell such incidents.")

Civ. A. No. 87-0533, 1989 WL 10598 at *1-2 (D. D.C. Jan. 31, 1989). Likewise, Institute for Policy Studies v. Dept. of the Air Force involved the "Security Classification Guide (Guide) for defendant's Groundwave Emergency Network (GWEN) program." 676 F. Supp. 3, 4 (D. D.C. 1987). Release of the documents in each of these cases would not simply increase the chance that the law would be broken, but would "'hinder investigations [and] enable violators to avoid detection.'" Dirksen, supra, at 1458.

The Bureau has instead focused solely on the grounds that release of the maps would increase the chance of the law being broken, i.e., a terrorist attack on the dams, and has not even attempted to show that the proper standard has been met BOR Brf. at 20-22. That being said, the threat of terrorism is obviously a matter of grave importance to all. However, as explained in Living Rivers' opening brief and in section 1.C, supra (incorporated herein), release of the maps would not in fact cause an increased risk of harm to the dams. For these reasons, the Bureau has failed to show that the inundation maps meet the "circumvention of law" test of the High 2 exemption.

## D.    The "High 2" Exemption Should Be Rejected

Given that the Bureau has not met its burden of showing the applicability of the High 2 exemption, the Court need not consider whether to adopt it or not. However, several points raised

15

by the Bureau merit a response in the event the Court does choose to address this issue.

First, the Tenth Circuit has only "recognized" the High 2 exemption in terms of "recognizing" that four circuits have adopted it. See BOR Brf. at 23. The Court of Appeals has plainly held that it has not yet decided the issue. Audubon Society at 1204 ("[E]ven if we were to adopt the high 2 analysis, the maps are not sufficiently 'related to internal personnel rules and practices.'").

Second, the Bureau argues that because the Fifth and Sixth Circuit decisions rejecting the High 2 exemption were issued before Dept. of Air Force v. Rose, 425 U.S. 352, 364 (1976), they are unpersuasive. BOR Brf. at 26. However, this argument is without merit. As Living Rivers explained in its opening brief, the Supreme Court stated that the Senate Report (which rejects the High 2 exemption), rather than the House report, reflects the true Congressional intent regarding Exemption 2, adopting the reasoning of Judge Wilkey who rejected the High 2 interpretation in Vaughn v. Rosen, 523 F.2d 1136 (D.C. Cir.1975). 425 U.S. at 365-67.[4] Judge Wilkey authored the dissent in Crooker, supra, the en banc D.C. Circuit opinion upon which most High 2 jurisprudence is based and which overruled Vaughn v. Rosen. To the extent it is relevant that these cases were decided before Rose, the Supreme Court's decision supports, rather than undercuts, those decisions.

Third, the Bureau argues that the Fifth Circuit's decision in Stokes v. Brennan, rejecting the High 2 exemption, is suspect because the court did not find that release of the documents would cause a violation of law. BOR Brf. at 26, citing 476 F.2d 699, 702 (5th Cir. 1973). However, the

---

[4] . The Bureau seeks to avoid this conclusion by arguing that Rose "recognized the import of the House report" to "circumvention of law" documents. BOR Brf. at 27 n. 6. However, Rose merely stated that such an argument could be made and had been adopted by some courts and rejected by others- but the Court ultimately concluded that "[f]or the reasons stated by Judge Wilkey [in Vaughn v. Rosen], . . . we too 'choose to rely upon the Senate Report' in this regard." Rose at 366-67.

cited passage is not from the court's discussion of Exemption 2, but rather another exemption. Id. Where the court actually examines Exemption 2, it first determined that it would not accept the High 2 interpretation, so it was logical that it did not make a finding on the "circumvention of law" aspect of the documents in dispute. Id. at 702-03.

Fourth, the Bureau cites various district court opinions that are inconsistent with the ones that have rejected the High 2 analysis. Living Rivers admits that some district courts have followed the Circuits that have adopted the High 2 exemption. However, rather than base its decision on which position is more popular and pick which group of courts to join, in the event the Court examines this issue it should go back to the statutory language and legislative history and make its own decision, as discussed in Heartwood's opening brief.

Lastly, the Bureau argues that Kaganove v. EPA supports the High 2 exemption because it held that the incorporation of Crooker into Exemption 7(E) shows that "Crooker accurately expresses congressional intentions." BOR Brf. at 27-28, citing 856 F.2d 884, 889 (7th Cir. 1988), cert. denied 488 U.S. 1011 (1989). However, Kaganove failed to recognize that if Congress felt that Crooker should have been codified in an expanded manner to include documents other than law enforcement manuals as were at issue in Crooker, it would have amended Exemption 2 to include the broad High 2 interpretation urged by the Bureau here. However, Congress specifically limited its action to amending Exemption 7(E) to include "guidelines for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(2)(7)(E); Kaganove at 889. Given that "FOIA is to be broadly construed in favor of disclosure, and its exemptions are to be narrowly construed," it must be presumed that if Congress approved of the broad High 2 exemption as urged here, it would have incorporated it into Exemption 2 and not limited its application to law enforcement guidelines as were at issue in Crooker, and it

17

would go beyond Congressional intent to expand it any further. See Audubon Society at 1203, citing

Anderson v. Department of Health & Human Services, 907 F.2d 936, 941 (10th Cir.1990).

**CONCLUSION**

For these reasons, the Court should declare that the Bureau improperly withheld the

inundation maps, and order the Bureau to release them to Living Rivers.  As discussed, however,

Living Rivers would certainly accept redactions to the maps to the extent they actually show

vulnerabilities of the dams.

RESPECTFULLY SUBMITTED December 6, 2002.

_____
Matt Kenna
Kenna & Hickcox, P.C.
679 E. 2nd Ave., Suite 11 B
Durango, CO  81301
Phone: (970) 385-6941
Fax:    (970) 385-6804
*Pro Hac Vice*

Joro Walker USB #6676
Director, Utah Office
Land and Water Fund of the Rockies
1473 South 1100 East, Suite "F"
Salt Lake City, UT 84105
Phone: (801) 487-9911
Fax:    (801) 486-4233

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on December 6, 2002, I mailed a copy of this document to the following counsel of record by First-Class, U.S. Mail:

Marcia Berman
Elizabeth J. Shapiro
Robert D. McCallum, Jr.
U.S. Dept. of Justice, Civil Division
Federal Programs Bench, Rm 7204
20 Massachusetts Ave., NW
Washington, D.C.  20530

Carlie Christensen
Paul M. Warner
U.S. Attorney's Office
185 S. State St, #400
Salt Lake City, UT 84111-1538

Matt Kenna

19

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.