MARCIA BERMAN (Pro Hac Vice)
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW, Room 7204
Washington, D.C. 20530
Tel: (202) 514-3330
Fax: (202) 616-8470

CARLIE CHRISTENSEN
Assistant United States Attorney (0633)
185 South State Street, #400
Salt Lake City, Utah 84111-1538
Tel: (801) 524-5682
Fax: (801) 524-6924

*Attorneys for the United States Bureau of Reclamation*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| **LIVING RIVERS, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil No.** |
| | : | **2:02 CV 0644 TC** |
| **vs.** | : | |
| | : | |
| **UNITED STATES BUREAU OF** | : | |
| **RECLAMATION,** | : | |
| | : | |
| **Defendant.** | : | **Hon. Tena Campbell** |

## DEFENDANT UNITED STATES BUREAU OF RECLAMATION'S REPLY MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT



## INTRODUCTION

In its response to defendant BOR's cross-motion for summary judgment, Living Rivers correctly zeroes in on the issue at the heart of this FOIA case: "whether, as a practical matter, release of the [inundation] maps [showing which areas and communities would be flooded in the event of a catastrophic breach of Hoover Dam or Glen Canyon Dam] would increase the risk of attack on Glen Canyon and Hoover dams." (Living Rivers' response brief at 3). In a detailed, specific and reasonable declaration, BOR's Director of Safety, Security and Law Enforcement explained BOR's judgment that releasing the inundation maps would indeed increase the risk of an attack on the dams and determination that the maps should be withheld from disclosure under FOIA. (Todd Declaration, Ex. 3 to BOR's Cross-Motion for Summary Judgment). Living Rivers counters BOR's declaration, which is based on BOR's expertise and therefore entitled to substantial weight, with nothing more than conclusory, back-of-the-hand denials. In contrast to BOR's declaration, Living Rivers' unsupported position that no harm would in fact come from the release of these maps must be rejected.

Living Rivers fails to respond in any substantive way to the declaration of Larry Todd, submitted in support of BOR's withholding of the inundation maps. Mr. Todd explained that the specific risk of releasing the maps to the public is that the maps would allow terrorists (or others intent on harming the dams and the downstream communities) to evaluate the attractiveness of Hoover Dam and Glen Canyon Dam as targets of terrorism because the maps show the maximum harm to be achieved by attacking the dams. (Id. at ¶¶ 12, 14-21). The maps not only show which particular communities and populations would be affected by the destruction of the dams, but they also identify affected critical infrastructure sites, buildings and facilities. (Id. at ¶ 12, 17). For instance, the maps reveal which power plants, communication facilities, roads and bridges would be taken out in the event

of a catastrophic failure of the dams. (Id. at ¶¶ 12, 14, 17, 18). They also show the time it would take for massive flooding to occur and anticipated water levels, which, in concert with the infrastructure information, could be used to plan and execute sequenced attacks. (Id. at ¶¶ 12, 15, 18). In addition, BOR allocates security resources at BOR dams and facilities based upon risk assessment information contained in the maps, so a terrorist could deduce from the maps information about security provided at the dams. (Id. at ¶ 10). In short, the inundation maps provide a blueprint of the damage that would result from an attack on the dams and therefore would encourage an attack on the dams, and could also be used to carry out such an attack. (Id. at ¶¶ 12, 14-21).

Living Rivers' failure to acknowledge and dispute the content of BOR's declaration with anything but speculation is the overarching flaw in its responsive brief. Living Rivers accepts that release of the maps could inform terrorists of the extent of damage that could result from an attack on the dams, but then summarily denies the consequences of terrorists possessing this information, as set forth in BOR's declaration. See, e.g., Living Rivers' responsive brief at 3 ("The inundation maps simply would not . . . aid in actually carrying out an attack or help a perpetrator evade apprehension"); id. at 9 ("The Bureau has not shown that release of the maps would actually lead to an increased risk of attack on the dams . . ."). Living Rivers' speculation is insufficient to rebut BOR's specific, detailed, reasonable and plausible declaration, which the law affords substantial weight. (See BOR's opening brief at 3-4).

It is because the risk of terrorists using the information in the inundation maps to target the dams for attack is real and serious that the Court should uphold BOR's decision to withhold them from disclosure under FOIA's Exemptions 2, 3 and 7. Living Rivers argues that the Court should closely

scrutinize BOR's Exemption 7 claim, but does not contest the standard put forth by BOR for evaluating

its Exemption 7 claim – that BOR's purpose in compiling the inundation maps fell within its sphere of

law enforcement authority – and does not argue that BOR's use of the maps does not fall within BOR's

law enforcement authority. Living Rivers' rebuttal to BOR's invocation of Exemption 3 rests on a

restrictive reading of the nondisclosure provision of the National Historic Preservation Act and on its

denial of BOR's judgment that releasing the inundation maps would risk harm to Hoover Dam. Lastly,

Living Rivers' Exemption 2 argument is based on a misunderstanding of BOR's argument about the test

for "high 2" and, again, on its failure to acknowledge BOR's declaration.

I.     THE INUNDATION MAPS MEET THE REQUIREMENTS OF EXEMPTIONS
       7(E) AND 7(F).

The inundation maps are exempt from disclosure under Exemption 7 because they satisfy the

threshold requirement of Exemption 7, as they are "information compiled for law enforcement

purposes," and their release would cause the harms outlined in 7(E) and 7(F). Living Rivers' primary

argument in opposition to BOR's argument is that a heightened level of scrutiny is applicable to an

Exemption 7 claim asserted by a "mixed-function" agency such as BOR. Living Rivers further argues

that the inundation maps do not fall within traditional notions of "law enforcement materials," defined by

Living Rivers as involving the detection or punishment of violations of law. (Living Rivers' response

brief at 4-8). Neither of these arguments defeats BOR's claim that Exemption 7 applies.

Living Rivers contends that a court must apply some higher level of scrutiny to an Exemption 7

claim by an agency with both administrative and law enforcement functions than it does to an Exemption

7 claim by an agency whose primary function is law enforcement. (Id. at 4-5). But Living Rivers never

says what the standard is for this heightened scrutiny, other than to say that a court must employ

"skepticism" in examining a mixed-function agency's Exemption 7 claim. (Id. at 6). More importantly,

Living Rivers does not take issue with BOR's statement of the test for evaluating whether a mixed-

function agency has satisfied the "compiled for law enforcement purposes" threshold for Exemption 7.

Such an agency "must demonstrate that its purpose in compiling the particular document fell within its

sphere of enforcement authority." (BOR's opening brief at 6) (citing Church of Scientology v. U.S.

Department of the Army, 611 F.2d 738, 748 (9th Cir. 1979)). An agency whose primary function is

law enforcement "need only establish a 'rational nexus' between enforcement of a federal law and the

document for which an exemption is claimed." Church of Scientology, 611 F.2d at 748 (quoting Irons

v. Bell, 596 F.2d 468, 472 (1st Cir. 1979)). See also Pratt v. Webster, 673 F.2d 408, 420-21 (D.C.

Cir. 1982). How these formulations differ in practice is less than clear, but it is irrelevant because there

is no dispute as to what the applicable standard is in this case: BOR must demonstrate that its purpose

in compiling the inundation maps fell within its sphere of enforcement authority.

Importantly, it is BOR's law enforcement authority that matters, not a per se law enforcement

agency's law enforcement authority, nor popular notions of what the phrase "law enforcement authority"

means. BOR's law enforcement authority, centered on protecting BOR lands and facilities rather than

on investigating and prosecuting crimes after-the-fact, is also uncontroverted in this case. Congress has

undisputedly endowed BOR with express "law enforcement authority" to "maintain law and order and

protect persons and property within Reclamation projects and on Reclamation lands." 43 U.S.C.A. §

373b. See also BOR's opening brief at 6. This preventive and protective security orientation to BOR's

law enforcement authority may not accord with Living Rivers' understanding of "law enforcement," but it

is the law enforcement authority that Congress granted BOR, and it is a legitimate law enforcement

mission. As discussed in BOR's opening brief, efforts focused on protecting against and preventing

violations of law are just as important law enforcement functions as investigating and prosecuting crime

after it has been committed, and are indeed part of a "common-sense" understanding of law

enforcement functions. See BOR's opening brief at 8-9.

Living Rivers' statement that in order for documents to qualify as "law enforcement materials,"

"'they must involve the detection or punishment of violations of law,'" is inaccurate. (Living Rivers'

response brief at 7). The cases cited by Living Rivers in support of this proposition all involved

documents arising in the course of an investigation – a context which typically involves detection or

punishment of law violators. (Id., citing Ortiz v. U.S. Dept. of Health and Human Services, 70 F.3d

729, 732 (2d Cir. 1995); Allnutt v. U.S. Dept. of Justice, 99 F. Supp.2d 673, 679-80 (D. Md. 2000);

Malizia v. U.S. Dept. of Justice, 519 F. Supp. 338, 347-48 (S.D.N.Y. 1981)). But since Congress

broadened Exemption 7 in 1986, it is clear that Exemption 7 is not limited to information related to a

specific investigation, nor is it limited to investigatory records, but extends to all "records or information

compiled for law enforcement purposes." Exemption 7 has in fact been applied to non-investigatory

information used to protect against and prevent violations of law – a situation that often does not

involve detection or punishment of law violators. See BOR's opening brief at 8-9 (citing cases).

BOR uses the inundation maps consistent with its law enforcement authority. It is the context in

which a document is currently being used, rather than the purpose for which the document was

originally created or compiled, that is relevant in determining whether it is "compiled for law

enforcement purposes."[1]  See John Doe Agency v. John Doe Corp., 493 U.S. 146, 153 (1989);

KTVY-TV v. United States, 919 F.2d 1465, 1469 (10th Cir. 1990).  BOR's declaration establishes

that BOR uses the inundation maps to protect BOR lands and facilities, persons and property within

BOR lands and facilities, and communities downstream from BOR lands and facilities, in the event of a

massive failure of Hoover or Glen Canyon dams.  (Todd Declaration at ¶¶ 8, 10, 11, 27, 28, 30).  This

use of the maps clearly falls within the sphere of BOR's law enforcement authority.  Again, Living

Rivers does not quarrel with this analysis.  Its tact instead is simply to declare, without explanation or

reasoning, that the inundation maps are "unlike" the documents at issue in the cases relied upon by BOR

for the proposition that protection and prevention are recognized law enforcement functions, and then

to conclude that the maps do not meet the threshold of Exemption 7.  (Living Rivers' response brief at

6-8).  The Court should reject this empty conclusion.

    Living Rivers further argues that the inundation maps do not fall within the language of

Exemption 7(E) because that subpart only applies to "manuals containing law enforcement guidelines."

(Living Rivers' response brief at 8-9).  Living Rivers emphasizes adherence to the statutory language

here (id. at 9), but the wording of Exemption 7(E) clearly shows that 7(E) is not limited to law

---

[1] Contrary to Living Rivers' assertion, it is not BOR's position that "any document that could be used by law enforcement at some point would be exempt under FOIA."  (Living Rivers' response brief at 6) (emphasis added).  Rather, it is because BOR does use the inundation maps in furtherance of its law enforcement authority that they are "compiled for law enforcement purposes."  Thus, in Living Rivers' hypothetical (id.), if a police department did in fact use information regarding emergency medical care to prepare for potential emergencies, and if such activity fell within the sphere of the police department's law enforcement authority, the information could possibly be "compiled for law enforcement purposes."  Of course, the release of such information would still have to present one of the particularized harms enumerated in the subparts of Exemption 7 to be exempt from FOIA under Exemption 7.

enforcement manuals. Rather, Exemption 7(E) protects from disclosure information compiled for law enforcement purposes where release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). As demonstrated in BOR's opening brief, courts have applied this exemption to information that would reveal protective and preventive techniques, procedures or guidelines. See BOR's opening brief at 8-11 (citing cases). The court in U.S. News & World Report v. Dept. of the Treasury, Civ. Action No. 84-2303, 1986 U.S. Dist. LEXIS 27634, at * 6-7 (D.D.C. Mar. 26, 1986), did not "throw out" the language of Exemption 7(E) as Living Rivers' argues, but rather recognized that the Secret Service's techniques and procedures are protective and preventive, due to its mission to protect the President, and that Congress intended to afford these activities as much protection as more traditional investigative law enforcement techniques.

Living Rivers' response to BOR's argument that the inundation maps are exempt under Exemption 7(F), which protects from disclosure information compiled for law enforcement purposes where release of the information "could reasonably be expected to endanger the life or physical safety of any individual," 5 U.S.C. § 552(b)(7)(F), is merely to proclaim, without further elaboration, that release of the inundation maps would not lead to an increased risk of attack on the dams. (Living Rivers' response brief at 10). Aside from being wholly conclusory, this unsupported statement stands in direct contradiction to BOR's declaration, in which Mr. Todd explained how the release of the maps would increase the risk that terrorists would attack the dams and how, conversely, withholding the maps from public disclosure prevents such an attack (Todd Declaration at ¶¶ 15-20). BOR, not

Living Rivers, is charged with the relevant expertise to evaluate the effect of releasing the inundation maps, and it is BOR's judgment that releasing the maps would increase the risk of a terrorist attack on the dams that is entitled to substantial weight.[2]

## II.  THE HOOVER DAM INUNDATION MAPS ARE EXEMPT UNDER EXEMPTION 3.

Living Rivers similarly ignores BOR's finding that the Hoover Dam inundation maps must be withheld in order to protect a National Historic Resource, the Hoover Dam, because release of the inundation maps would pose a risk of terrorist attack on the dam and its attendant structures – a finding that is entitled to deference.  (Todd declaration at ¶ 31).  Living Rivers states that the Hoover Dam inundation maps do not relate to the character of Hoover Dam, but does not explain why.  The maps show the consequences of a massive failure of Hoover Dam – i.e., how the water currently contained by the dam would flow out and travel following a total failure of the dam at full reservoir capacity.  (Id. at ¶¶13-14).  It is perfectly consistent with the language of the nondisclosure provision of the National Historic Preservation Act to conclude that these maps contain "information about the . . . character . . . of a historic resource [Hoover Dam]," 16 U.S.C. § 470w-3(a), particularly in light of the fact that the intent of this nondisclosure provision was to "assure protection of [historic] sites from theft, vandalism or destruction."  House Report No. 96-1457 on Pub. L. 96-515, see 1980 U.S. Code Cong. and Adm. News, at 6409 (emphasis added).

---

[2]Living Rivers' opinion that release of the maps would help more than hurt the people who live in affected areas has no place in a FOIA analysis.  It is well-settled that the requester's intended use of the information is irrelevant in a FOIA action.  See, e.g., Abraham & Rose, P.L.C. V. United States, 138 F.3d 1075, 1078-79 (6th Cir. 1998).

III.  THE INUNDATION MAPS ARE EXEMPT FROM DISCLOSURE UNDER
      THE "HIGH 2" ANALYSIS FOR EXEMPTION 2.

As an initial matter, Living Rivers misunderstands BOR's argument concerning the test for the

"high 2" exemption.  BOR did not argue, as Living Rivers contends, that there is no requirement that the

information relate to the internal personnel rules and practices of the agency in order to be exempt

under the "high 2" analysis.  (Living Rivers' response brief at 12).  To the contrary, BOR argued that

information must relate to the "internal personnel rules and practices of an agency," as the statute

requires, but that this phrase has been given an expansive reading by courts that have developed and

applied the "high 2" analysis.  These courts have held that this phrase includes materials that instruct

agency personnel how to do the substantive aspects of their jobs; that it is not limited to the kinds of

matters that the term "personnel" often connotes – that is, matters relating to pay, pension, vacations,

hours of work, lunch hours, parking, etc.  (BOR's opening brief at 17-19, citing cases).  <u>See</u> <u>also</u>

<u>Founding Church of Scientology v. Smith</u>, 721 F.2d 828, 829-30 (D.C. Cir. 1983)).  Thus, a true

application of the "high 2" analysis should incorporate this interpretation of the phrase "internal

personnel rules and practices of an agency" rather than the limited notion of "personnel" used in "low2"

cases, and it was the Tenth Circuit's inattention to this distinction in <u>Audubon Society v. U.S. Forest</u>

<u>Service</u>, 104 F.3d 1201 (10th Cir. 1997), that BOR criticized. (BOR's opening brief at 23-24).

Living Rivers' belief that the inundation maps do not instruct BOR personnel in how to do their

jobs is, again, belied by BOR's declaration.  As the declaration makes clear, the inundation maps are a

critical resource used by BOR personnel in protecting the dams and downstream communities from

flooding caused by a breach in the dams.  The maps were created to help BOR understand and

develop plans to respond to hazards downstream of its dams. They show which areas, infrastructure sites, facilities, and populations would be affected by a massive failure in the dams, and BOR personnel use this information to develop and implement emergency response plans, as well as to allocate security resources amongst BOR facilities. The maps are an essential tool used by BOR in its coordination with other law enforcement and emergency management agencies. (Todd declaration at ¶¶ 6-8, 10-11, 27-28, 30). The fact that the maps instruct via topography, as opposed to written prose, does not diminish their instructive character or value, and a holding that instructions must be written out in prose to be exempt under Exemption 2 would elevate form over substance.[3]

## CONCLUSION

For all the foregoing reasons, as well as all the reasons stated in BOR's opening brief, BOR respectfully requests that the Court deny plaintiff Living Rivers' motion for summary judgment, grant BOR's cross-motion for summary judgment, and enter judgment in favor of defendant Bureau of Reclamation on the grounds that the requested inundation maps are exempt from disclosure under FOIA.

---

[3]BOR's opening brief addressed the arguments raised by Living Rivers in its response about the acceptance of the "high 2" analysis in other circuit courts. (BOR's opening brief at 25-27). BOR also explained in its opening brief how the Supreme Court's decision in Department of the Air Force v. Rose, 425 U.S. 352, 361 (1976), supports the "high 2" analysis and how the authorities upon which Living Rivers' relies predate Rose and Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1061 (D.C. Cir. 1981) (en banc), and are not persuasive in light of Rose and Crooker. (BOR's opening brief at 16-17, 25-26).

OF COUNSEL:

CARLIE CHRISTENSEN
Assistant U.S. Attorney

ROBERT MOLL
ROBIN FRIEDMAN
Division of General Law
Department of Interior

Respectfully submitted,


Robert D. McCallum, Jr.
Assistant Attorney General

Paul M. Warner
United States Attorney, District of Utah

Elizabeth J. Shapiro, Assistant Branch Director
U.S. Department of Justice, Civil Division
Federal Programs Branch


MARCIA BERMAN, PA Bar No. 66168
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW, Room 7204
Washington, D.C. 20530
Tel: (202) 514-3330
Fax: (202) 616-8470

*Attorneys for Defendant United States Bureau
of Reclamation*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2002, a true and correct copy of the foregoing Defendant United States Bureau of Reclamation's Reply Memorandum in Support of its Cross-Motion for Summary Judgment, was served by Federal Express overnight mail, on counsel for plaintiff at the addresses listed below:

Matt Kenna
679 E. 2nd Ave., Suite 11B
Durango, CO 81301

Joro Walker
Land and Water Fund of the Rockies
1473 South 1100 East, Suite "F"
Salt Lake City, Utah 84105


Marcia Berman