FILED
CLERK, U.S. DISTRICT COURT

25 MAR 03 AM 10: 50

DISTRICT OF UTAH

BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LIVING RIVERS, INC., | |
| Plaintiff, | O R D E R |
| vs. | |
| UNITED STATES BUREAU OF RECLAMATION, | Case No. 2:02-CV-644TC |
| Defendant. | |

Plaintiff Living Rivers, Inc. ("Living Rivers"), a non-profit, incorporated environmental

group, claims that Defendant the United States Bureau of Reclamation (the "BOR") violated the

Freedom of Information Act ("FOIA") by refusing to disclose documents that Living Rivers

requested under FOIA. The documents are inundation maps prepared by the BOR for the areas

below Hoover Dam and Glen Canyon Dam. The BOR contends that disclosure of the maps

could endanger the dams and those who live downstream from the dams, and therefore are

exempt from disclosure under FOIA. The matter is before the court on the parties' cross-motions

for summary judgment. For the reasons set for below, the court GRANTS BOR's motion and

denies Living Rivers' motion.

**BACKGROUND**

I.      Procedural Background

On September 19, 2001, Living Rivers requested pursuant to FOIA that the BOR disclose



all inundation maps, including those pertaining to dam failure, for the areas below Hoover Dam

and Glen Canyon Dam.  On November 9 and November 19, 2001, the BOR denied the requests

on the ground that the maps were exempt from disclosure under FOIA's Exemption 2.  The BOR

explained that the inundation maps related to the BOR's internal practices and that disclosure of

the maps would risk circumvention of a statute or regulation.  Living Rivers appealed the

decisions administratively on December 10, 2001.  On April 2, 2002, the United States

Department of the Interior—of which the BOR is a part—denied the appeal.  On July 3, 2002,

Living Rivers filed this lawsuit.

I.      Factual Background

        In support of their motion, the BOR submitted the Declaration of Larry L. Todd.  (Todd

Decl., Ex. 3, attached to BOR's Mem. in Support of Def. BOR's Cross Mot. for Summ. J. and in

Opp'n to Pl.'s Mot. for Summ. J.)[1]  Mr. Todd has been the Director of Security, Safety and Law

Enforcement of the BOR since June 30, 2002.  This position was created after September 11,

2001.  Before September 11, security, safety and law enforcement matters were handled by the

Director of Operations.  Mr. Todd held that position until his present position was created.

        Mr. Todd explained that the BOR created the maps

    to allow evaluation of the effects of dam failure, to protect the public downstream of the
    dam from the consequences of dam failure, and to assist federal and local law
    enforcement and emergency officials by providing timely and concise emergency
    information in the event of dam failure.  In addition, the inundation maps are a key
    element in allowing the BOR to determine the risks at various dams and to set priorities
    in addressing issues of dam safety.

(Todd. Decl. ¶ 10 )

_____

        [1]Living Rivers did not submit any factual materials that would dispute Mr. Todd's
statements.

Mr. Todd described the information shown in the inundation maps:

> Inundation maps show which downstream areas and communities would be flooded and are at risk in the event of a dam failure. The maps reveal populated areas, communities and recreational areas that would be at risk due to dam failure. The maps also show critical infrastructure, such as power plant sites, that would be affected by the failure. The maps show estimated travel times for the flood progression at key locations, which are usually communities or populated areas. Most of the maps also show estimated flow volumes and water depths at these key locations.

(Id. ¶ 12)

According to Mr. Todd, "[t]he inundation maps include information that is unique and not otherwise readily ascertainable by the public." (Id. ¶ 21). Therefore, "[t]he precise nature of flood damage that would result from a failure of the dams, as depicted in the inundation maps, is not known by the general public." (Id.)

Mr. Todd explained that, in his opinion,

> [t]he information shown on the inundation maps would comprise dam security and the security of the surrounding populations if the maps fell into the hands of a terrorist or other person intending to harm one or more of the Colorado River dams (collectively, "terrorist"). The inundation maps would give the terrorist information about the amount of damage that could be caused by destroying a dam. Because the inundation maps are based upon a worst-case scenario, they present a broad view of the extent of damage resulting from breaching the dam, thus making the dam a more attractive target to the terrorist.

> In addition to identifying the populations that would be affected by the destruction of a dam, the inundation maps could be used to identify critical infrastructures, buildings, and facilities which would be destroyed by attacking the dam. This information too is valuable to terrorists.

> Because the inundation maps show flood travel times and water depths, terrorists could use the inundation maps to help plan and execute sequenced attacks, which could include attacks on bridges and roads to cut off evacuation routes or attacks on communications facilities to disrupt emergency response.

(Id. ¶¶ 16–18.)

3

Mr. Todd described the measures that the BOR takes to ensure the security of the inundation maps. These include keeping the maps in locked areas and limiting the distribution of the maps to those who "demonstrate a 'need to know' [including State and Federal law enforcement and emergency officials] in accordance with the criteria set forth in the BOR directives." (Id. ¶ 24).

## ANALYSIS

I.      The Legal Standard for Summary Judgment in FOIA Cases

"FOIA generally provides that the public has a right of access, enforceable in court, to federal agency records." Audobon Soc'y v. United States Forest Serv., 104 F.3d 1201, 1203 (10th Cir. 1997). FOIA requires federal agencies to disclose records to the public upon request, "unless the requested records fall within one or more of nine categories of exempt material." Assassination Archives and Research Ctr. v. Cent. Intelligence Agency, 177 F. Supp. 2d 1, 5 (D.C. Cir. 2001); see also Audobon, 104 F.3d at 1203. If a requested document contains exempt information, the agency must release "[a]ny reasonably segregable portion" after deleting exempt portions. 5 U.S.C. § 552(b); see also Anderson v. Dep't of Health & Human Servs., 907 F.2d 936, 941 (10th Cir. 1990) (stating that the district court "may not simply conclude that an entire file or body of information is protected without consideration of the component parts").

"FOIA is to be broadly construed in favor of disclosure, and its exemptions are to be narrowly construed. . . . The federal agency resisting disclosure bears the burden of justifying nondisclosure." Audobon, 104 F.3d at 1203 (internal citation omitted). District courts review de novo agency decisions to withhold information requested under FOIA. See Anderson, 907 F.2d at 941.

4

Here, the BOR claimed initially that its inundation maps fit under Exemption 2, which permits withholding of information "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). On this review of the agency action, the BOR claims that it also need not disclose its inundation maps pursuant to Exemptions 7(E) and 7(F), 5 U.S.C. § 552(b)(7), which pertain to information compiled for law enforcement purposes, and Exemption 3, 5 U.S.C. § 552(b)(3), which incorporates nondisclosure provisions of other federal statutes.

II.    Exemption 2

As stated above, Exemption 2 exempts disclosure of documents "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The so called "Low 2" approach to Exemption 2 provides that the exemption only applies to "[p]redominantly internal documents that deal with trivial administrative matters." See Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1207 (D.C. Cir. 1992). But the BOR initially denied Living Rivers's FOIA requests under the expansive, "High 2" interpretation of Exemption 2.[2]

At least four circuits have adopted the "High 2" interpretation of Exemption 2. See Audobon, 104 F.3d at 1203–04, 1204 n.1 (citing Schwaner v. Dep't of Air Force, 898 F.2d 793, 794 (D.C. Cir. 1990), Caplan v. Bureau of Alcohol, Tobacco & Firearms, 587 F.2d 544, 547 (2d Cir. 1978); Kaganove v. Envtl. Prot. Agency, 856 F.2d 884, 889 (7th Cir. 1988), and Hardy v. Bureau of Alcohol, Tobacco & Firearms, 631 F.2d 653, 656 (9th Cir. 1980)). The Tenth Circuit has neither adopted nor rejected the High 2 interpretation. See Audobon, 104 F.3d at 1204; Hale v. United States Dep't of Justice, 973 F.2d 894, 902 (10th Cir. 1992) (stating that Exemption 2

_____

[2]The BOR does not argue that the inundation maps should be withheld under the Low 2 approach. (See Def.'s Supp. Mem. at 15, 19.)

"possibly" encompasses "more substantial matters that might be the subject of legitimate public interest *if* the disclosure of the latter might pose a risk of circumvention of lawful agency regulations"), <u>overruled in later appeal on other grounds</u>, 2 F.3d 1055 (10th Cir. 1993).

Under the High 2 approach, government information is exempted if: "(1) the information falls within the language of the exemption—that is, it relates to the 'internal personnel rules and practices' of the agency and is 'predominantly internal'; and (2) its disclosure would risk circumvention of federal statutes or regulations." <u>Audobon</u>, 104 F.3d at 1203–04 (quoting <u>Crooker v. Bureau of Alcohol, Tobacco & Firearms</u>, 670 F.2d 1051, 1074 (D.C. Cir. 1981)).

Living Rivers contends that the inundation maps fail both prongs of the High 2 test. As regards the first prong of the test, Living Rivers, relying on Tenth Circuit case law, argues that the inundation maps do not relate to the BOR's "personnel" rules and practices and therefore do not fall within the statutory language of Exemption 2. But the BOR contends that because the maps are "predominantly internal," they are covered by Exemption 2. In <u>Audobon</u>, a case on which Living Rivers relies, the Tenth Circuit held that the requested maps, which identified specific owl nest sites in Arizona and New Mexico, were "not sufficiently 'related to internal personnel rules and practices' and would therefore fail the first prong" of the High 2 exemption if the court were to adopt that analysis. <u>Audobon</u>, 104 F.3d at 1204. The court addressed the Forest Service's argument that the "maps [were] related to agency practices because they assist[ed] Forest Service personnel in their management duties." <u>Id.</u> The court emphasized that the phrase "'internal personnel' modifies both 'rules' and 'practices.'" <u>Id.</u> "Therefore, the proper inquiry [was] not whether the owl maps relate[d] to the 'agency practices,' but whether they relate[d] to the '*personnel* practices' of the Forest Service." <u>Id.</u> (emphasis in original). The court concluded that "[i]t stretch[ed] the language of the exemption too far to conclude that owl

maps 'relate[d]' to personnel practices of the Forest Service." Id.

As in Audobon, the BOR here argues that the inundation maps are related to agency practices and personnel because they assist the BOR in its law enforcement duties. The BOR gives as an example the fact that BOR personnel "utilize the maps to develop their own emergency response plans." (Def.'s Supp. Mem. at 20.) As Living Rivers points out, however, the maps neither provide instructions nor contain rules or practices for BOR personnel. The court agrees with Living Rivers and concludes that the first prong of the High 2 exemption test has not been met.

III.     Exemption 7

At the administrative level, the BOR did not cite Exemption 7 when it refused to disclose the inundation maps to Living Rivers. Because FOIA directs district courts to review agency actions de novo, an agency may raise a particular exemption for the first time in the district court. See 5 U.S.C. § 552(a)(4)(B) (providing for de novo review); Young v. CIA, 972 F.2d 536, 538 (4th Cir. 1992) (stating that "an agency does not waive FOIA exemptions by not raising them during the administrative process"); see also Ford v. West, 149 F.3d 1190, available at 1998 WL 317561, at **1 (10th Cir. 1998) (unpublished decision) (addressing exemption raised for the first time in district court). Further, Living Rivers does not argue that the BOR's initial reliance on Exception 2 precludes the BOR from now relying on other exemptions.

Exemption 7 prevents disclosure of "information compiled for law enforcement purposes" when producing such information

> (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any

individual.

5 U.S.C. § 552(b)(7).[3]

The threshold issue under Exemption 7 is whether the BOR may be classified as a "law enforcement agency." See Church of Scientology v. United States Dep't of the Army, 611 F.2d 738, 748 (9th Cir. 1979); see also Fine v. United States Dep't of Energy, Office of Inspector General, 823 F. Supp. 888, 907 (D.N.M. 1993).  Courts have stated that "[a]n agency which has a clear law enforcement mandate . . . need only establish a 'rational nexus' between enforcement of a federal law and the document for which an exemption is claimed." Pratt v. Webster, 673 F.2d 408, 420 (D.C. Cir. 1982) (quoting Church of Scientology, 611 F.2d at 748).  "An agency with both administrative and law enforcement functions must demonstrate that its purpose in compiling the particular document fell within its sphere of enforcement authority." Fine, 823 F. Supp. at 907.  In Pratt, the D.C. Circuit stated that "a court must scrutinize with some skepticism the particular purpose claimed [by a mixed-function agency] for disputed documents redacted under FOIA Exemption 7." Pratt, 673 F.2d at 418.

Living Rivers and the BOR disagree on the scope of Exemption 7's "law enforcement purpose" requirement.  The BOR contends that materials compiled for purposes of protecting against and preventing violations of law, as opposed to only "the more traditional law enforcement functions of investigation and prosecution," fall within Exemption 7's scope.  (See Def.'s Supp. Mem. at 8.)  Living Rivers claims that to qualify as law enforcement materials, the

------

[3]In 1986, Congress expanded Exemption 7's protection from "investigatory records" compiled for law enforcement purposes to "records or information" compiled for law enforcement purposes. See Hopkinson v. Shillinger, 866 F.2d 1185, 1222 n.27 (10th Cir. 1989), on reh'g, 888 F.2d 1286 (10th Cir. 1989), overruled on other grounds, Sawyer v. Smith, 497 U.S. 227, 233 (1990).

materials "must involve the detection or punishment of violations of law." (Pl.'s Reply Mem. at

5 (quoting Allnut v. United States Dep't of Justice, 99 F. Supp. 2d 673, 680 (D. Md. 2000)).

The BOR relies primarily on U.S. News & World Report v. Dep't of the Treasury, an

unpublished District of the District of Columbia decision. See U.S. News & World Report v.

Dep't of the Treasury, No. 84-2303, 1986 U.S. Dist. LEXIS 27634, at *5 (D.D.C. Mar. 26, 1986)

(unpublished decision). In U.S. News & World Report, the court held that the Secret Service

properly withheld pursuant to Exemption 7(E) specifications and other information relating to

the purchase of two armored presidential limousines, even though such information did not relate

to an investigation of a specific violation of the law. See id. at *3–5, *8. In its discussion of

Exemption 7's law enforcement purpose requirement, the court explained,

> The Secret Service is unique in that its law enforcement efforts are geared primarily
> towards prevention rather than apprehension. While its activities in this case, therefore,
> do not involve investigating someone suspected of violating the law, but center instead on
> its efforts to protect the President, there can be no doubt that they are directly related to
> the agency's statutory mandate.

Id. at *5. The court withheld information concerning the cars' specifications and components but

allowed disclosure of the final, total price of the presidential cars. Id. at *8, *10.

Living Rivers correctly points out that the agency involved in U.S. News & World

Report, the Secret Service, is a per se law enforcement agency. See U.S. News & World Report,

1986 U.S. Dist. LEXIS 27634, at *4. The standard for establishing a law enforcement purpose

therefore was lower in U.S. News & World Report than it is for the BOR, a mixed-function

agency. See Fine, 823 F. Supp. at 907.

Nevertheless, Congress has provided the BOR with express "law enforcement authority"

to "maintain law and order and protect persons and property within Reclamation projects and on

Reclamation lands." 43 U.S.C.A. § 373b(a). Mr. Todd, the BOR's Director of Security, Safety

and Law Enforcement, has stated that the BOR uses the inundation maps pursuant to the BOR's law enforcement authority.[4]  (See Todd Decl. at ¶¶ 8, 10–12); see also U.S. News & World Report, 1986 U.S. Dist. LEXIS 27634, at *5 (emphasizing that the agency activities in question were "directly related to the agency's statutory mandate").  For example, Mr. Todd explained that the maps show which downstream areas would be flooded in the event of a dam failure attack.  (Todd Decl. ¶ 12.)  The BOR uses the inundation maps to develop its Emergency Action Plans and to protect and alert potentially threatened people in the vicinity of the dams.  (Id. ¶¶ 8, 11.)

Living Rivers has put forth no contrary evidence,[5] but argues that the mere fact that the BOR *uses* the maps in law enforcement does not bring the maps under Exemption 7's scope.  But the context in which an agency has currently compiled a document, rather than the purpose for which the document was originally created, determines whether it is "compiled for law enforcement purposes."  See John Doe Agency v. John Doe Corp., 493 U.S. 146, 153–54 (1989) (stating that the phrase "compiled for law enforcement purposes" "seems readily to cover documents already collected by the Government originally for non-law enforcement purposes"); KTVY-TV v. United States, 919 F.2d 1465, 1469 (10th Cir. 1990), abrogated on other grounds recognized by Rosenfeld v. United States Dep't of Justice, 57 F.3d 803, 814 (9th Cir. 1995); (see also Def.'s Reply Mem. at 5–6).

Accordingly, the court concludes that the inundation maps are presently used and were compiled in direct relation to the BOR's statutory law enforcement mandate.  The BOR therefore

---

[4]The BOR argues that the court should accord substantial weight to the BOR's affidavits.  The court, however, gives no special deference to Mr. Todd's Declaration.

[5]In fact, Living Rivers has put forth no evidence to support any of its arguments.

satisfies the first prong of Exemption 7.

A.    Exemption 7(E)

The BOR contends that public disclosure of the inundation maps would cause the harms set forth in Exemption 7(E). Exemption 7(E) protects from disclosure information compiled for law enforcement purposes where release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The Tenth Circuit has explained that Exemption 7(E) "is to be applied only to techniques and procedures generally unknown to the public." Hale v. United States Dep't of Justice, 973 F.2d 894, 902 (10th Cir. 1992) (quoting Dunaway v. Webster, 519 F. Supp. 1059, 1082 (N.D. Cal. 1981)), overruled in later appeal on other grounds, 2 F.3d 1055 (10th Cir. 1993). "However, techniques and procedures may be exempt even if they are known to the public to some extent if disclosure of the circumstances of their use could lessen their effectiveness." Id. at 902–03.

The BOR argues that courts have applied Exemption 7(E) to information that would reveal protective and preventive techniques, procedures, or guidelines. In Librach v. Federal Bureau of Investigation, a case cited by the BOR, the Eighth Circuit assumed without discussion that documents that "pertain[ed] to the relocation of a witness under the Department of Justice Witness Security Program" could be withheld under "exemptions 5 U.S.C. § 552(b)(3), 7(C), and 7(E)." Librach v. Federal Bureau of Investigation, 587 F.2d 372, 373 (8th Cir. 1978); see also U.S. News & World Report, 1986 U.S. Dist. LEXIS 27634, at *7 (discussing Librach, 587 F.2d at 373). The BOR again relies upon U.S. News & World Report, where the court applied

11

Exemption 7(E) to withhold the Secret Service's presidential limousine specifications. See U.S. News & World Report, 1986 U.S. Dist. LEXIS 27634, at *6–7. The court in U.S. News & World Report emphasized "the unique [preventative] nature of [the Secret Service's] function," and rejected a "wooden interpretation" of Exemption 7(E). Id. at *6.

The BOR argues that disclosure of the maps "could reasonably be expected to risk circumvention of the law because they would assist terrorists in assessing which potential targets of terrorism would cause the maximum damage in terms of loss of life and property." (Def.'s Supp. Mem. at 10; see also Todd Decl. ¶ 20.) Mr. Todd explained in his Declaration that the maps show, among other information, which communities and infrastructure would be flooded by a catastrophic breach in the dams. (See Todd Decl. ¶¶ 12, 14.) The BOR adds that the inundation maps' "precise, valuable information" about potential flood damage and fatalities is not well known to the public. (Def.'s Supp. Mem. at 11–12; see also Todd Decl. ¶¶ 23–26 (describing efforts made to keep maps from the public)).

Nevertheless, as Living Rivers points out, the BOR does not explain how the information in the maps qualifies as "techniques and procedures . . . or would disclose guidelines for law enforcement investigations or prosecutions," as required by the "circumvention of law" exemption of 5 U.S.C. § 552(b)(7)(E). (Pl.'s Reply Mem. at 7.) The BOR's maps are not like the documents in a case such as U.S. News & World Report, where disclosing the requested limousine specificiations would have revealed structural *techniques* that served to prevent harm. See U.S. News & World Report, 1986 U.S. Dist. LEXIS 27634, at *6–7. This point is arguably too legalistic. However, given the narrow construction courts must give to FOIA's exemptions, the court concludes that the BOR has failed to establish how the inundation maps "would

disclose techniques and procedures . . . or . . . would disclose guidelines.'"[6] 5 U.S.C. §

552(b)(7)(E); see Audobon Soc'y v. United States Forest Serv., 104 F.3d 1201, 1203 (10th Cir.

1997) (stating that "FOIA is to be broadly construed in favor of disclosure, and its exemptions

are to be narrowly construed").

    B.    Exemption 7(F)

    The BOR also contends that public disclosure of the inundation maps "could reasonably

be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F);

(see Def.'s Supp. Mem. at 12). Exemption 7(F) is neither limited to protect the lives of "law

enforcement personnel," nor to known, named individuals only.[7] See Garcia v. United States

Dep't of Justice, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (applying Exemption 7(F) to protect

private citizen third parties). District courts in the D.C. Circuit and the Second Circuit have

stated that "[i]n evaluating the validity of an agency's invocation of Exemption 7(F), the court

should 'within limits, defer to the agency's assessment of danger.'" Id. (quoting Linn v. United

States Dep't of Justice, Civ. A. No. 92-1406, 1995 WL 631847, at *9 (D.D.C. Aug. 22, 1995)).

    The BOR contends that disclosure of the inundation maps "could reasonably place at risk

the life or physical safety of those individuals who occupy the downstream areas that would be

flooded by a breach of Hoover Dam or Glen Canyon Dam." (Def.'s Supp. Mem. at 13). In his

---

    [6]Living Rivers additionally argues that Exemption 7(E) applies only to "manuals
containing law enforcement guidelines." (Pl.'s Reply Mem. at 7.) As the BOR explains,
however, Exemption 7(E) is not by its terms limited to law enforcement manuals. See 5 U.S.C. §
522(b)(7)(E); (Def.'s Reply Mem. at 6–7).

    [7]Previously, Exemption 7(F) protected records that would "endanger the life or physical
safety of law enforcement personnel." Pub. L. No. 93-502, 88 Stat. 1561, 1563 (1974)
(subsequently amended).

declaration, Mr. Todd referred to a dam failure as a "weapon of mass destruction," mentioned that "[t]he maps show estimated travel times for the flood progression at key locations, which are usually communities of populated areas," and stated that the maps "are vital . . . to warn and evacuate people from potential flood zones." (Todd Decl. ¶¶ 15, 12, 27.) Mr. Todd also stated that "[t]errorists could use the innundation maps to estimate the extent of flooding that would be occasioned by attacking individual features of the dam.  Terrorists could also use the innundation maps to compare the amount of flooding and damage that would result from attacking one dam as compared to attacking another dam." (Id. ¶ 20.) Mr. Todd's statements concerning risk assessment by terrorists demonstrate that the release of the maps could increase the risk of an attack on the dams.

Living Rivers suggests that the court order the BOR to submit the maps in camera, see 5 U.S.C. § 552(a)(4)(B), and order the release of the portions of the maps that warrant exemption from FOIA.  Living Rivers does not oppose exempting information such as "flood travel times and water depths," which could be used in aid of an attack, but contends that "the maps generally, which show the areas that would be flooded, simply do not increase the likelihood or ease of an attack." (Pl.'s Reply Mem. at 9.)

Living Rivers acknowledges that the "material that would actually aid in carrying out a terrorist attack" should be redacted from the maps and exempted.  But the court is satisfied, after careful examination of Mr. Todd's declaration, that the BOR has carefully considered what material should be disclosed and what material should be withheld.  Therefore, the court concludes that the BOR has satisfied its burden of justifying non-disclosure of the inundation

maps.[8]

## ORDER

For the foregoing reasons, the BOR's motion for summary judgment is GRANTED and

Living Rivers's motion for summary judgment is DENIED.

DATED this __25__ day of March, 2003.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge

---

[8]Because BOR has established that nondisclosure is warranted under Exemption 7(F), the court does not reach the issue of whether Exemption 3 applies.

15

alt

United States District Court
for the
District of Utah
March 25, 2003


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:  2:02-cv-00644


True and correct copies of the attached were either mailed, faxed or e-mailed
by the clerk to the following:


    Joro Walker, Esq.
    LAND & WATER FUND OF THE ROCKIES
    1473 S 1100 E STE F
    SALT LAKE CITY, UT  84105
    JFAX 9,4864233

    Matt Kenna, Esq.
    KENNA & HICKOX
    679 E 2ND AVE STE 11B
    DURANGO, CO  81301
    EMAIL

    Marcia Berman, Esq.
    US DEPT OF JUSTICE
    CIVIL DIVISION
    FEDERAL PROGRAMS BRANCH RM 7204
    20 MASSACHUSETTS AVE NW
    WASHINGTON, DC  20530

    Ms. Carlie Christensen, Esq.
    US ATTORNEY'S OFFICE
    ,    84111
    EMAIL